1
2
3
4
5

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

6

7   3Pak LLC, D/B/A OMA BAP,

8                              Plaintiff,

9        v.

10  CITY OF SEATTLE,

11                             Defendant.

Case No.

COMPLAINT

JURY DEMAND

12
13        Plaintiff hereby alleges as follows:

14

15        1.      The rights of free speech and to peaceably assemble are enshrined in our

16  constitutional tradition. Plaintiff supports free-speech rights and the efforts of organizations such

17  as Black Lives Matter who, by exercising such rights, are bringing issues such as systemic racism

18  and unfair violence against African Americans by police to the forefront of the national

19  consciousness. Specifically, Plaintiff supports the free-speech rights of many of those who

20  gathered on Capitol Hill to form what has been called "CHAZ," standing for the "Capitol Hill

21  Autonomous Zone," or "CHOP," meaning the "Capitol Hill Organized Protest" or "Capitol Hill

22  Occupying Protest."[1] Plaintiff has donated to and sponsored fundraisers for Black Lives Matter,

23  including in June 2020.

24        2.      This lawsuit does **not** seek to undermine CHOP participants' message or present a

25

26  [1] This complaint primarily refers to the area as "CHOP," and the people who participated in CHOP who are not businesses, employees, or residents of the area as "CHOP participants."

COMPLAINT - 1

1   counter message. Rather, this lawsuit is about Plaintiff's constitutional and other legal rights of

2   which were overrun by the City of Seattle's decision to abandon and close off an entire city

3   neighborhood, leaving it unchecked by the police, unserved by fire and emergency health services,

4   and inaccessible to the public at large, and then materially support and encourage a hostile

5   occupation of that neighborhood. The City's decision subjected businesses, employees, and

6   residents of that neighborhood to extensive property damage, public safety dangers, and an

7   inability to use and access their properties.

8          3.      On June 8, 2020, the City abruptly deserted the Seattle Police Department's East

9   Precinct on the corner of Twelfth Avenue and E. Pine Street in Seattle's Capitol Hill neighborhood,

10  leaving behind numerous barriers that had previously been used as a line between police and

11  protesters.

12         4.      When the City abandoned the precinct and the nearby barriers, a number of

13  individuals who had been in the area took control of the barriers and used them to block off streets

14  in an area around the East Precinct.

15         5.      In the days and weeks after the City abandoned the East Precinct, CHOP

16  participants occupied the public streets, sidewalks, and parks in the area at all hours of the day and

17  night. Rather than seeking to restore order and protect the residents and property owners within

18  CHOP, the City instead chose to actively endorse, enable, and participate in the occupation of

19  CHOP.

20         6.      The City provided Cal Anderson Park, a public park located at the center of CHOP,

21  for use as the staging ground supporting CHOP's occupation of the surrounding area. Supported

22  by the City, countless CHOP participants resided in the park at all times of the day and night,

23  having turned it into a tent city. At any given time, hundreds of CHOP participants camped out in

24  the park. Violence, vandalism, excessive noise, public drug use, and other crimes were rampant

25  within the park, which is directly across the street from Plaintiff's storefront.

26         7.      The City's conduct resulted in CHOP being blocked off from public access. Among

COMPLAINT - 2

other conduct detailed below, the City provided the CHOP participants with concrete barriers to use to block the streets, which CHOP participants used to barricade the streets and create borders. These borders, at times, were guarded by armed CHOP participants who oversaw who could or could not enter CHOP. As a result, the streets were barred to almost all vehicular traffic, making it virtually impossible for residents and businesses to access their buildings, receive deliveries, and provide goods and services to the few customers willing to enter CHOP.

8.     The City's conduct also resulted in the elimination of basic public safety within CHOP and nearby areas. For example, the City enacted a policy under which police would not enter the CHOP area except during "mass casualties," and, even in those situations, the response was, at best, muted and late. After a fatal shooting in the early morning of June 20, 2020, for example, officers did not even approach the area of the shooting until approximately twenty minutes after the shooting, and no professional medical response was available. At other times, even during life-and-death emergencies, the police acquiesced to demands from CHOP participants that they abandon the area. The City acknowledged the serious safety issues it created, in particular noting that there were "dangerous conditions" at night, but the City nonetheless chose to maintain its policy of providing resources and support to the CHOP occupiers.

9.     The City's conduct enabled the widespread destruction and vandalism of private property. Graffiti was pervasive throughout the area—on barriers, streets, sidewalks, and nearly every private building within CHOP. Graffiti that was painted over almost immediately returned, and property owners were told by CHOP participants that if they dared to paint over graffiti, their buildings would be more severely vandalized or even burned to the ground. The City did nothing to prevent this conduct but instead actively endorsed and supported the ongoing occupation of the CHOP area and the destruction of property that accompanied it. As a result, property owners and their tenants were not able to fully use their properties. Property owners and tenants, for instance, had to lock and barricade their garages and loading areas at risk of having CHOP participants entering and vandalizing them.

MORGAN LEWIS & BOCKIUS LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200  FAX, (206) 407-2224

10.     The property owners, businesses, and residents in the area suffered ever-increasing property damage and economic loss every day that CHOP existed in their neighborhood, all because of the City's active support, encouragement, and endorsement of the occupation. In particular, City of Seattle Mayor Jenny Durkan provided the CHOP participants with not just tangible resources but also a de facto stamp of approval. Her tweets, interviews, and other statements made it clear that the City was fully aware of what was happening, had no plan or timeline for remedying the ongoing harm, and in fact viewed the occupation of Capitol Hill as something akin to a perpetual block party, which the City wanted to support because of the viewpoints of CHOP participants.

11.     Plaintiff pleaded with City representatives to cease enabling the destruction of its business and the imminent dangers posed in the neighborhood, but no action was taken to clear out CHOP until July 1, 2020.

12.     However, even after CHOP was officially "disbanded" on July 1, 2020, the ramifications of the City's actions continued to harm Plaintiff and the rest of the neighborhood. Through December 2020, despite a technical closure of Cal Anderson Park and the removal of most barriers in the streets and sidewalks, the City allowed Cal Anderson Park to remain occupied by a large encampment of protesters and homeless people, with the majority taking up residency across the street from Plaintiff's business. This was a de facto continuation of the City's CHOP policies that directly impacted Plaintiff.

13.     Again, this case is not about Plaintiff's agreement or disagreement with the inspiration for CHOP, or the viewpoints expressed by the people occupying that area. Instead, it is about the City's active, knowing endorsement and support of a destructive occupation of a neighborhood to the detriment of the well-being of those who live and work in that neighborhood.

## I.     PARTIES

14.     Plaintiff is a Washington limited liability company doing business as Oma Bap. Oma Bap is a fast-casual Korean restaurant located at 1640 Eleventh Avenue in Seattle.

MORGAN LEWIS & BOCKIUS LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

15.     Defendant is the City of Seattle ("the City"), a municipality incorporated in the State of Washington. The Seattle Police Department ("SPD") is a division of the City. Jenny Durkan was the Mayor and chief executive of the City, and a policymaker for the City, at relevant times.

## II.     JURISDICTION AND VENUE

16.     This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1331 because this action presents federal questions and seeks to redress deprivations of rights under the United States Constitution pursuant to 42 U.S.C. § 1983.

17.     Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because the events giving rise to these claims occurred in the Western District of Washington.

## III.     FACTUAL ALLEGATIONS

### A.     The Creation of CHOP

18.     On June 8, 2020, with protests ongoing near the East Precinct, the City emptied the East Precinct of all weapons and valuables, and then abandoned it.

19.     The City left behind at the precinct and in the surrounding areas large barriers that had been used in previous days to try to limit the movements of protesters.

20.     Predictably, almost immediately after the SPD abandoned the precinct and the barriers, CHOP participants used the barriers to block off streets in the area and create a "no-cop" zone. Initially, the blocked-off area extended to all streets within one block from the precinct.

21.     Without any police presence, the CHOP participants organized themselves, declared the area "Free Capitol Hill," and stationed guards by the barriers that the City had abandoned, thereby creating borders for the occupied area. The area later expanded, was referred to as "CHAZ" for several days, and eventually became known as "CHOP."

22.     CHOP's unofficial boundaries stretched north to East Denny Way, east to 13th Avenue, south to East Pike Street, and west to Broadway. It encompassed the entirety of Cal Anderson Park and sixteen city blocks in all.

COMPLAINT - 5

**MORGAN LEWIS & BOCKIUS LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200  FAX, (206) 407-2224

1      **B.      The Activities of CHOP Participants**

2           23.     After the SPD vacated Capitol Hill, the CHOP participants claimed the area as their

3      own with a physical presence and a loose form of governance and justice.

4           24.     CHOP participants have maintained borders with barriers and people patrolling the

5      perimeter, as well as vehicles parked in the middle of rights-of-way.

6           25.     Many CHOP participants lived on the streets and sidewalks and in Cal Anderson

7      Park, in tents such as the following:

 

16          26.     They painted graffiti on most available surfaces, and if a property owner painted

17     over the graffiti, the graffiti was typically replaced within a few hours. CHOP participants even

18     threatened business owners with retaliation if they painted over graffiti. Examples of this pervasive

19     graffiti include the following:

COMPLAINT - 6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26











COMPLAINT - 7

**MORGAN LEWIS & BOCKIUS LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL. (206) 407-2200   FAX. (206) 407-2224

27.     CHOP participants created various unpermitted, ad hoc food dispensaries and stores on public property in front of and near private residences and businesses.

28.     CHOP participants created a "medical tent" at the Rancho Bravo restaurant under a festival tent.

29.     On occasion, CHOP participants acted as a replacement police force, including by demanding that business owners release individuals who were caught committing crimes and by attempting to perform their own crime investigations.

30.     CHOP participants occupied the streets and sidewalks twenty-four hours a day, and had speeches, debates, movies, music, and various other activities—including, in some instances, illegal fireworks shows—on the streets and sidewalks. Disturbances and noise pollution extended well past 10 p.m. and typically into the early morning of the next day.

31.     CHOP participants were observed carrying guns in the public streets and parks in broad daylight.

32.     Cal Anderson Park was one of the focal points of CHOP. The approximately seven-acre park, located directly across the street from Plaintiff, was ostensibly owned by the City, but was entirely handed over to the CHOP participants. The City supported and enabled CHOP's occupation of the park through providing washing/sanitation facilities, portable toilets, nighttime lighting, and other material support.

33.     As a result of the City's actions, Cal Anderson Park was transformed into a massive tent city for CHOP participants, as shown here.

 

COMPLAINT - 8

1
2
3
4
5
6
7
8

 

9
10
11
12

34.     Members of the public could not use Cal Anderson Park. CHOP's control of the park continued unabated until July 1, 2020, when it was temporarily cleared. Local residents attempting to take pictures too close to Cal Anderson Park were threatened by CHOP participants, who have said they would steal their smartphones.

13
14

35.     CHOP participants even built makeshift gardens on the park's lawn to grow food for CHOP. The City handed over public property in the park for this use, as shown here:

15
16
17
18
19
20
21

 

22
23
24

36.     The gardens remain in Cal Anderson Park, despite having been built in violation of City laws, and (on information and belief) have not received the approval to remain a permanent fixture as required pursuant to Cal Anderson Park's historic designations.

25
26

37.     Although Cal Anderson Park was officially cleared and closed to the public on July 1, 2020, the City almost immediately allowed the park to be reoccupied without any consequences

MORGAN LEWIS & BOCKIUS LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

for those occupying it, until the encampment was once again removed in December 2020. The post–July 1 encampment was smaller but at least as troublesome for Plaintiff as CHOP, given its location of only a few dozen feet from Plaintiff's front door, with a clear sight line to Plaintiff's business.

38.     The post–July 1 encampment included tents that were set up in the supposedly closed Cal Anderson Park for what was indicated as "ANTIFA outreach," which entailed handing out free food, beverages, and clothing to those encamped in the park.

39.     Cal Anderson Park's occupation was a central nuisance and key source of damage for Plaintiff. The various occupations of the park created excessive noise, even late into the night, in violation of the City's ordinances. Occupants set off fireworks at all hours of the day and night. Trash, feces, and other refuse built up in the park, affecting the whole area. Worst of all, Cal Anderson Park was one of the most violent areas of CHOP and remained violent and dangerous throughout 2020.

**C.     The Effects of CHOP and the Subsequent Occupation**

> **1.     Lack of public-safety assistance even in life-threatening circumstances.**

40.     The City's endorsement and recognition of CHOP went so far that the SPD adopted a policy and practice of not entering an area it called "the Red Zone" except in the case of what the police called a "mass casualty event (e.g., active shooter, structural fire likely to endanger human lives, etc.)." The Red Zone encompassed all of CHOP and included Plaintiff's location from its official adoption on June 12, 2020 until the morning of July 1, 2020, although the policy was de facto in place as of the night of June 8, 2020.

41.     Under this policy, felonies that did not endanger significant numbers of lives, such as rape, kidnapping, and assaults not involving weapons, were deemed unworthy of an in-person response. Anyone wishing to report such a crime would have to leave the area that the SPD felt was too dangerous to send its officers into.

COMPLAINT - 10

**MORGAN LEWIS & BOCKIUS LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

42.     And under the policy, even when the SPD was faced with a "mass casualty event" inside the Red Zone, they did not respond directly; instead, the policy required officers to gather outside the Red Zone for strategic planning before responding to murders or structural fires.

43.     The SPD additionally declared as part of the Red-Zone policy that in the wider area known as the Edward Sector (which roughly correlates to the entire Capitol Hill neighborhood) even the most minor crimes would require four officers to be available to respond, even if it would normally require only one.

44.     This predictably had an immediate impact on the neighborhood by both increasing response times and the likelihood that crimes would be committed and unreported. As then–SPD Chief Carmen Best explained on June 11, 2020, as she stood next to then-Mayor Durkan:

> SPD has a responsibility to provide public safety services to the entire East precinct and the City. The actions of a small group cannot and should not deprive an entire segment of our community from public-safety services. In the first day of the SPD not having access to the precinct, response times for crimes in progress were over fifteen minutes, about three times as long as the average . . . . If that is your mother, or your sister, your cousin, your neighbor's kid that is being raped, robbed, assaulted, and otherwise victimized, you're not going to want to have to report that it took the police three times longer to get there to provide services to them. The difference in the amount of time could protect someone's life and prevent a violent attack.

45.     Actual events demonstrate that, if anything, Chief Best was being conservative in her description of the public-safety emergency in CHOP.

46.     At approximately 2:20 a.m. on June 20, 2020, there were two people shot in CHOP. At least one of the shootings happened at or near the intersection of Tenth Avenue and Pine Street, around the corner from the abandoned East Precinct. One of the victims died before reaching the hospital. The second was admitted with life-threatening injuries.

47.     Raw video streamed from the area shortly after that shooting demonstrates the enormity of the risk created by the City for anyone who lives or works in CHOP. That video clearly

COMPLAINT - 11

captured the following:[2]

    a.    The video appears to start a couple of minutes after the shooting.

    b.    One shooting victim was taken to the CHOP "medic tent" located in a parking lot under a festival tent.

    c.    No professional medics arrived to tend to the first shooting victim despite being in the area and seeing what was going on. The first victim was transferred by private vehicle to Harborview Medical Center and died.

    d.    No police were in the area until approximately eighteen minutes into the video, when cars and lights can be seen several blocks away, and police can be heard on megaphones demanding that barriers be moved to allow the police to enter.

    e.    Approximately nineteen minutes into the video, a small phalanx of approximately eight police officers entered the area on foot and arrived in the area of the medical tent, apparently for the purpose of trying to locate and extract the first shooting victim.

    f.    The phalanx of officers was immediately surrounded, yelled at, and pursued by CHOP participants.

    g.    One police car finally entered the area approximately twenty minutes into the video.

    h.    The police did not engage with the crowd and promptly left the area, after which CHOP participants created a human chain across the street to bar any further entry.

    i.    There was a second shooting victim in CHOP located a couple of blocks away. It appears that no medics or police responded at all to the location of the second victim.

    j.    Approximately thirty-five minutes into the livestream video, the second

---

[2] https://www.facebook.com/WWConverge/videos/297548387941384/?v=297548387941384

COMPLAINT - 12

victim was placed into a plain white cargo van and presumably taken to the hospital. A voice can be heard explaining that Medic One drove by but did not come to the assistance of the person who ended up in the white van.

k.     Shortly after the second victim was driven away, private citizens began looking for bullet casings. No police were on the scene to perform any investigation in the immediate aftermath of the shooting.

48.     Later on, the morning of June 20, 2020, Mayor Durkan called this shooting "foreseeable and avoidable" in an email to Chief Best and Fire Chief Harold Scoggins.

49.     On June 21, 2020, another shooting occurred in the area at approximately 11:00 p.m. at night. There was no police or medic response, and the shooting victim was transported to the emergency room by private vehicle.

50.     In a press conference with Mayor Durkan on June 22, 2020, Chief Best reiterated the seriousness of the public-safety situation, stating:

> there are countless individuals who are in the CHOP that are there to engage, as the Mayor said earlier, in peaceful demonstrations. But there are also groups of individuals engaging in shootings, a rape, assaults, burglary, arson, and property destruction, and I have their police reports right here. [*Holding up a stack of papers*] I'm not making it up. These things have happened. We cannot walk away from the truth of what is happening there. This is not about politics and I'm not a politician. This isn't a debate about First Amendment rights. This is about life or death. So we need a plan.

51.     After June 20, there were shootings in and around CHOP nightly or nearly nightly, many of which police and fire did not respond to in person. One of these was in the early hours of June 29, at 12th and Pike, and left a sixteen-year-old dead and a fourteen-year-old in critical condition.

52.     According to reports, the shooting began when "CHOP security" opened fire on a white Jeep that had crashed into the CHOP barricades. Reports indicate that over a dozen shots were fired. Police and fire did not respond to the scene until the victims had been transported by

MORGAN LEWIS & BOCKIUS LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

private vehicle and the crime scene had been compromised and cleared of evidence.

53.     The City did not provide emergency medical services at the scene of the shooting in the CHOP area. Instead, one of the victims was transported by private vehicle out of the CHOP area and to a hospital. The other had to be taken "to a meeting point with Seattle Fire Department Personnel, who then transported the victim to Harborview Medical Center."

54.     By the time the police reached the scene of the shooting at 12th and Pike to begin an investigation, much of the key evidence had already been tampered with or lost. As the SPD blotter put it, when police arrived on the scene to inspect the Jeep, "it was clear the crime scene had been disturbed."

55.     Over the course of nine days, there were two homicides in CHOP. There had been no homicides in Capitol Hill in 2020 before CHOP started, and in all of 2019 there were only three homicides in the entire Capitol Hill neighborhood.

56.     An academic study conducted in 2021 regarding crime in and near CHOP confirmed a direct, causal correlation between the City's police policies in June 2020 and a sharp increase in crime in CHOP and the surrounding neighborhood.

57.     During June 2020, the Seattle Fire Department ("SFD") also had its own "red zone," where it would not enter the area in and around CHOP without police first securing the area. In practical terms, this meant that there were no paramedic services available for anything other than "mass casualty events" in and around CHOP, and that even in those cases the SFD often did not show up at all because the SPD failed to secure the scene.

58.     It became public knowledge soon after the adoption of the police and fire zones that police and medics would not respond. This emboldened and attracted criminal elements and made it significantly less likely that victims would bother to call police.

59.     The SPD's lack of response to Cal Anderson Park and the area around Plaintiff's location continued after CHOP as well. SPD officers informed Plaintiff's owner, Peter Pak, that they were under instructions not to enter Cal Anderson Park for any reason, even months after

MORGAN LEWIS & BOCKIUS LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200  FAX, (206) 407-2224

1   CHOP, and even though it was known that individuals who had broken Plaintiff's windows were

2   residing in the park.

3       60.     And when officers did respond to some calls for assistance in the vicinity of

4   Plaintiff's location after July 1, 2020, the response was late and inadequate. This included, for

5   example, responding after thirty minutes to a call about an individual who had pointed a gun at

6   numerous people, and confiscating the gun but not arresting the assailant. There were also times

7   when the police never responded to calls for assistance, despite the fact that Plaintiff is located

8   approximately one block from the East Precinct. In September 2020, for example, the manager of

9   Plaintiff's building reported a large fight with numerous participants near the building, but the

10  police never responded.

11              **2.      Impeded access to Plaintiff's business.**

12      61.     The streets and sidewalks directly adjacent to Oma Bap and in the nearby area were

13  constantly impeded during CHOP—as well as on occasion during the subsequent occupation of

14  Cal Anderson Park—by CHOP participants, subsequent park occupants, and the City itself.

15      62.     CHOP participants regularly moved makeshift barriers, large objects, and barriers

16  provided by the City to CHOP wherever they wished to block traffic, sidewalks, and all other

17  manner of ingress and egress. This almost always included both Eleventh Avenue and Olive Street.

18  Oma Bap is located at the corner of Eleventh and Olive.

19      63.     In many cases, this meant that Plaintiff's employees, suppliers, and customers could

20  not safely access Plaintiff's business or simply avoided the area entirely.

21      64.     The barriers and their impact on Plaintiff were magnified by the City's decision to

22  turn the corner of Eleventh and Olive—again, just outside Plaintiff's door— into the epicenter of

23  its public-sanitation support of CHOP. The City decided to provide garbage and restroom service

24  to CHOP participants by placing enormous dumpsters and numerous portable toilets at the

25  intersection, thereby ensuring that occupants were continually dumping garbage and human waste

26  outside Oma Bap, and making the area unsightly, unsanitary, unsafe, and treacherous to navigate.

COMPLAINT - 15

65.     Although the dumpsters and at least some of the portable toilets were removed in July 2020, the portion of Cal Anderson Park near Oma Bap retained its reputation as the preferred occupation area of the park to set up residency for the remainder of 2020 as a direct result of the City's designation of the corner as an area to provide services to the occupiers. This included the park occupiers continuing to use Eleventh and Olive throughout 2020 as a place to dump piles of trash, knowing the City would come and collect it, which it continued to do.

**3.     Impact on Plaintiff.**

66.     The impact on Plaintiff's business was immense. While Plaintiff's business had been impacted by COVID, Plaintiff was well positioned to weather the pandemic as a fast-casual restaurant and had seen its business begin to increase in April and May 2020 until CHOP and its aftermath destroyed Plaintiff's revenue stream.

67.     Because of the conditions created by CHOP, in June 2020 and subsequently, Plaintiff's employees, its customers and its suppliers were deterred from coming to Oma Bap. Oma Bap suffered significantly decreased revenue and profits as a direct result of the City's actions and policies.

68.     Access to Plaintiff's business was impeded or impaired by the City's actions, CHOP, and CHOP participants in at least the following ways:

a.     On multiple occasions in June 2020, Plaintiff's suppliers could not access the business or determined it was unsafe to do so because of CHOP and its aftermath.

b.     On multiple occasions in June 2020 and later, food-delivery services such as DoorDash could not access the business or determined it was unsafe to do because of CHOP and its aftermath, resulting in lost orders and business.

c.     On multiple occasions in June 2020 and later, customers could not or did not access Plaintiff's business because of the conditions created by CHOP and its aftermath.

d.     Oma Bap's manager quit in September 2020 due to the stress and anxiety of living in CHOP and its aftermath, and other employees were also worried for their safety on a

MORGAN LEWIS & BOCKIUS LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1    daily basis.

2    e.    On multiple occasions in the aftermath of CHOP, individuals posing as delivery drivers would steal food, beverages, and snacks. Calls to the police regarding these incidents received no response.

5    69.    Plaintiff's outdoor tables were frequently overturned and there were numerous attempts by occupants of the park to steal its outdoor seating.

7    70.    Oma Bap was forced to close entirely on June 20, 2020, and to close early on other days later in 2020 because of unsafe conditions caused by CHOP and later occupations of Cal Anderson Park.

10    71.    Oma Bap was also forced to cancel revenue-generating events at its location with other food vendors because the other vendors feared for their safety.

12    72.    Oma Bap suffered thousands of dollars in damages from vandalism to its physical business, including numerous times that its store windows were scratched or shattered by people residing in Cal Anderson Park. Often this would happen during daylight hours when individuals could be easily seen but appeared not to be at all concerned from September 2020 through February 2021, Plaintiff simply had its windows boarded up because it was virtually certain they would be broken again after any repair.

18    73.    The City was specifically aware of the harm caused to Plaintiff and its business. Plaintiff's owner, Peter Pak, repeatedly spoke to City officials about what Plaintiff was experiencing, both during and after CHOP. Those officials included the business liaison for the Mayor's office, as well as Michael Wells and Bobby Lee of the City's Office of Economic Development. Mr. Wells also widely distributed his summaries of conversations with Mr. Pak to others in the City.

24    74.    In conversations with Mr. Pak, Mr. Wells and Mr. Lee indicated on more than one occasion that they believed the City had been negligent in its handling of CHOP and in particular how its actions had affected Plaintiff, urged Mr. Pak to file a tort claim with the City, and indicated

MORGAN LEWIS & BOCKIUS LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1    that the City would or should reimburse Plaintiff for the harm.

2         75.    In reliance on this encouragement from Mr. Wells and Mr. Lee, Plaintiff filed a

3    claim for damages with the City on September 22, 2020, for a conservatively estimated $76,616.

4    The City responded months later with an offer of $500, far less than the cost of just the windows

5    that were broken. Plaintiff was shocked and offended that the City would not pay even a

6    conservative claim, and rejected the offer.

7         76.    Plaintiff's damages exceed the amount stated in the claim filed with the City.

8         **D.    The City Actively Supported and Encouraged CHOP and CHOP
                Participants**

9

10        77.    In the face of all this destruction, City leaders, including Mayor Durkan, embraced

11   the existence, message, and methods of CHOP and CHOP Participants. They did this with physical

12   support and extensive verbal support and encouragement that expressly endorsed the barricading

13   and occupation of City streets and parks.

14        78.    Since the day that the City abandoned the East Precinct, the City had full knowledge

15   of the problems created for businesses and residents in and around CHOP, including property

16   damage, lack of police response, the inability for workers and residents to enter and leave the area,

17   the inability for businesses to receive deliveries, and other adverse impacts on residents,

18   businesses, and property owners in the area. This knowledge was based on complaints from people

19   such as Plaintiff, as discussed above, and direct observation of the area by City officials. This

20   included several visits to CHOP by Mayor Durkan and her chief of staff, as well as the daily

21   presence during June 2020 of Chief Scoggins, then–Seattle Public Utilities head Mami Hara, then-

22   director of the Seattle Department of Transportation Sam Zimbabwe, and Seattle Parks Department

23   official Joey Furuto. These individuals reported back to the Mayor and the Mayor's office about

24   what they had observed.

25        79.    The City nevertheless adopted a policy supporting the CHOP occupation, acting

26   with deliberate indifference toward those suffering harm from it. Evidence of the City's knowledge

**MORGAN LEWIS & BOCKIUS LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

includes the following:

    a.    At a June 11, 2020 press conference with Mayor Durkan, Chief Best made it clear that the City was fully aware that its 9-1-1 response times had tripled and that there was a serious public-safety crisis for anyone who lives or works in CHOP.

    b.    On June 16, 2020, the City stated, via a press release from the Mayor's office:

> Beginning last Tuesday, City officials have been on site on Capitol Hill to work [to] meet community needs including hygiene, sanitation and safety. Utilities including Puget Sound Energy and SPU have been able to respond to the area for service. Seattle Police Chief Carmen Best has visited the site multiple times. Over the past week, conversations continued between City officials, organizers onsite for the CHOP, residents and businesses. . . . Every day, Seattle Fire Chief Harold Scoggins, Seattle Department of Transportation Director Sam Zimbabwe, and Seattle Public Utilities General Manager Mami Hara have been on site. On Sunday, they held a meeting with onsite organizers, small businesses, and residents to discuss proposed changes to the protest zone.

    c.    Mayor Durkan and the SPD were inundated with complaints about CHOP that describe in detail the extensive property damage, restricted access, and economic loss that residents, businesses, and property owners were suffering.

    d.    In response to at least some requests from desperate businesses and residents for her to cease her support of CHOP, Mayor Durkan's office provided a stock response acknowledging that the City was "maintaining" a space for CHOP, including by, for example, providing a "sturdier concrete barrier" to help CHOP block a public street. The stock response stated in part as follows:

> Thank you for reaching out.
>
> The Capitol Hill Organized Protest has emerged as a gathering place where community members can demand change of their local, state, and federal government. Capitol Hill and Cal

COMPLAINT - 19

Anderson Park have long been a gathering place for justice. While there have been inaccurate and misleading depictions of the CHOP from the President and some national media, the City believes first amendment activities can continue while also maintaining public safety and allowing access for residents and businesses who operate in the area. Mayor Durkan believes these changes can help ensure any focus of the CHOP and Cal Anderson will allow for peaceful demonstrations to continue.

Beginning last Tuesday, City officials have been on site on Capitol Hill to work [to] meet community needs including hygiene, sanitation and safety. Utilities including Puget Sound Energy and SPU have been able to respond to the area for service. Seattle Police Chief Carmen Best has visited the site multiple times. Over the past week, conversations continued between City officials, organizers onsite for the CHOP, residents and businesses. The City is committed to maintaining space for community to come together, protest and exercise their first amendment rights. Minor changes to the protest zone will implement safer and sturdier barriers to protect individuals in this area, allow traffic to move throughout the Capitol Hill neighborhood, ease access for residents of apartment building in the surrounding areas, and help local businesses manage deliveries and logistics. Additionally all plans have been crafted with the goal of allowing access for emergency personnel including fire trucks.

Every day, Seattle Fire Chief Harold Scoggins, Seattle Department of Transportation Director Sam Zimbabwe, and Seattle Public Utilities General Manager Marni Hara have been on site. On Sunday, they held a meeting with onsite organizers, small businesses, and residents to discuss proposed changes to the protest zone. In coordination with protesters onsite, work began at 6:30 a.m. on Tuesday to remove a tent barrier at 10th and Pine and replace it with a sturdier concrete barrier to improve public safety. The City has successfully worked with protesters onsite to reconfigure the CHOP to allow for public safety and better access for the local community. That has involved rerouting traffic, freeing up alley access, opened streets, and replacing makeshift barriers with heavy concrete barriers that can be painted.

  e. Mayor Durkan herself personally visited CHOP and saw what was happening. In an interview given in her City offices on Facebook Live on June 12, 2020, Mayor Durkan made clear that she had seen the barriers and talked to CHOP participants

MORGAN LEWIS & BOCKIUS LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL. (206) 407-2200   FAX, (206) 407-2224

and apparently approved of them using an individual with behavioral health issues to enforce the perimeter: "It's interesting, when I was at the CHAZ, walking around, similar kind of philosophy, because there's this one guy, some behavioral health issues, and it was like, look, he has some hard times, and he helps on that barricade over there, and then when he starts having a hard time, we just bring him over here, take care of him, feed him. And that's what you gotta do, right?"[3]

      f.      On June 22, 2020, Mayor Durkan stated at a press conference:

> Over the days, tens of thousands of people have peacefully gathered or visited Capitol Hill. During the day, there have been no major incidents. But we know it is very different at night, particularly in recent nights. The cumulative impacts of the gatherings and protests and the nighttime atmosphere and violence has led to increasingly difficult circumstances for our businesses and residents. Most of them supported protesters' right to gather at the outset. They stand with them in solidarity. But the impacts have increased, and the safety has decreased. Both on Saturday morning and last night there were incidents of gun violence. And that escalating violence concerns me, Chief Best, residents, businesses, and the greater community. All of Capitol Hill has been impacted.

      g.      At the same June 22, 2020 press conference, Chief Best stated that reports to the police demonstrate that some CHOP participants are "engaging in shootings, a rape, assaults, burglary, arson, and property destruction, and I have their police reports right here. I'm not making it up. These things have happened."

      h.      At a press conference on June 29, 2020, the morning after yet another fatal

---

[3] https://www.facebook.com/WWConverge/videos/250593506242797/?__tn__=kC-R&eid=ARBT9Zl4Zd0BnqFUyG1bgaapWeIo6meLrp9YI7QgiIK36tLAFfNcpij4zHFTEwP0wNzoVQK7O1LPtpa8&hc_ref=ARTeZJ-MVhRABE0ZxnSxzApxaoAJVsmqCzhgB7vaP0wwkcuhf0CtwXnjqpvqfAIKLQk&__xts__[0]=68.ARDhXBScmD_P9GnI4X2NL4z0eUgRkuV8hj_BUWpBgtqxg133nAdZz00w2pqmYlrfVrVanpZgUlgy2rw9hbGAwTWLjcxp1fAPAVjYhDHpvEOpeSmJavdPNPPlK_wodfv_idPwOeVfsbgsB04YjUKfXfnUZvddSThmUspA_o5oqETWWFluP2o_Yh-tP64swtkdKoXl374Vd0zqTxRoapQChSzCt5dXToGlW6ESVGiUVQznk42YXs8U2lpzAwJmp99RXyrNW3fSYzUcPopUKTNN-KP7EBDNdje9UibYcP84111ipRk31bjIk5XrSRcU2rjmqzsd_KjoOwrpoHYKssQd5Vnwe6OvBXCSGW_4ctaQKXmwUcmaTA

MORGAN LEWIS & BOCKIUS LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

shooting in the CHOP area, Chief Best repeatedly emphasized how dangerous the situation was within CHOP, stating:

> [I]t's very unfortunate that we have yet another murder in this area identified as the CHOP. Two African American men dead at a place where they claim to be working for Black Lives Matter. But they're gone. They're dead now. And we've had multiple other incidents – assaults, rape, robbery, and shootings. And so, you know, this is something that is going to need to change. We're asking people to remove themselves from this area for the safety of the people. If they care about people, they're gonna have to try to help us to make it safe. Not opposed to anybody's issue or concern. They certainly can demonstrate, you know, and peacefully any place, but they can't hostilely take over a neighborhood and cause the crime levels to go up like this. Two men are dead. Two men are dead. And a child, a 14-year-old, is hospitalized and we don't know what is gonna happen to that kid.
>
> ….
>
> You know, at this point, the East Precinct, while important to us, what's much more important is that this neighborhood is not under siege and that there are not people being victimized. You know, the precinct is a building. The precinct is a building. But people dying, rapes, robbery, assault – that is what we need to deal with. *That's* what we need to deal with.
>
> ….
>
> I have said this multiple times, it is taking us three and a half times longer to get here. We have a fire station that is less than two blocks from here, they cannot go into this area. We have had so many issues and problems. And, you know, I have the police reports, people have identified as victims . . . we need to make sure that we are able to provide public safety. *That* is what needs to happen.
>
> ….
>
> As an African American woman, with uncles and brothers and stuff, I wouldn't want them to be in this area. We've had two men killed. And we have a child that's injured from gunfire. So this is a real problem. And I would question why we would continue to allow this to happen.

COMPLAINT - 22

….

I think everybody in city government has been talking about what we can do to have a reasonable response, that limits any issue or danger, but we also recognize that a place where we have seen now two murders, multiple people injured, there needs to be some more action for public safety. I think everybody can agree on that.

….

[T]his situation as you reporters are walking around, you can see that it can be dangerous and unacceptable, and so we're gonna have to work through this. This is not safe for anybody. Not anybody. Multiple cases. Two murders. And it's not right. So, thank you for your time. I think there will be other times we will get a chance to talk and go over it. But, as you can see, this is not an acceptable situation. Thank you.

     i.     At one point during this same press conference, in response to a question about whether the City-provided barriers had saved lives by preventing a Jeep from entering the CHOP area, Chief Best responded:

Yeah, I don't agree. I absolutely do not agree with that. I think that is absolutely ludicrous. I'm not gonna let the detractors and the naysayers and the agitators be the ones who are the voice here. There are people who live here, there are multiple people who are being injured and hurt, and we need to do something about it. It is absolutely irresponsible for this to continue.

     j.     On July 1, 2020, Chief Best stated in a press conference, "This order and our police response comes after weeks of violence in and around the Capitol Hill Occupied Protest zone, including multiple shootings resulting in many injuries and two deaths. . . . Our job is to support peaceful demonstrations. But what has happened here on these streets over the last two weeks – few weeks, that is – is lawless and it's brutal and bottom line it is simply unacceptable."

     k.     The City adopted its police Red Zone and its fire department red zone, and

COMPLAINT - 23

**MORGAN LEWIS & BOCKIUS LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200    FAX, (206) 407-2224

directed other employees to avoid CHOP and Cal Anderson Park out of a concern for the safety of its employees, but left Plaintiff and others to fend for themselves in the area it deemed too dangerous for its workforce.

80.     The extent of the City's knowledge of what was going on in CHOP is demonstrated by the following from Mayor Durkan's emergency order that went into effect on July 1, 2020:

**MORGAN LEWIS & BOCKIUS LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200  FAX, (206) 407-2224

WHEREAS, after significant national attention, many protestors have left the area but the conditions in the Cal Anderson Park Area have deteriorated to the point where public health, life, and safety are threatened by activities in and around this area, as supported by the following facts:

- On June 20, 2020, the first of three incidents of firearms violent with multiple victims occurred; one individual was shot and killed, and another was shot and seriously injured.
- First responders from the Seattle Fire Department and Seattle Police Department were denied safe access to the area by hostile crowds, including armed individuals, and obstructions.
- On June 22, 2020, a second incident involving firearms violence injured two addition individuals. On June 26, 2020, SDOT employees attempted to remove a limited number of barriers, but unarmed employees were met with hostility and weapons. SDOT could not conduct operations.
- Access by first responders to emergencies have been impeded further. On the morning of June 28, demonstrators moved the concrete barriers to completely restrict access of fire and medics on multiple roads. Demonstrators had previously agreed to open these areas to access for residents, businesses, city services, and fire.
- On June 29, 2020, a juvenile was shot and killed, and another juvenile was seriously injured in the immediate vicinity of this area. Evidence indicates that this murder may have been committed by individual(s) "occupying" the area.
- On June 30, 2020, SDOT removed a limited number of barriers with SPD, but was quickly met with agitated opposition to the removal.
- In addition, SPD has received numerous reports of narcotics use and violent crime, including rape, robbery, assault, and increased gang activity. An increase of 525%, 22 additional incidents, in person-related crime in the area, to include two additional homicides, 6 additional robberies, and 16 additional aggravated assaults (to include 2 additional non-fatal shootings) between June 2nd and June 30th, 2020, compared to the same period of time in 2019.
- Residential and businesses in the area have documented incidents of harassment, graffiti, noise disturbances, and obstruction of vehicular traffic to residences and places of business, and multiple lawsuits and claims have been filed against the City by residents and businesses impacted by the activities in this area.
- Significant damage has been caused by those remaining unlawfully in the area to City property, including Cal Anderson Park and the East Precinct facility. The full extent of damage to the East Precinct remains an open question until city employees are allowed access to the site in order to make that assessment.
- Open fires and vehicles on the reservoir are placing important regional water infrastructure located within Cal Anderson at risk.
- An alarming recent rise in COVID-19 numbers across the region, coupled with a lack of social distancing in this area, and the daily attraction to this area of outside individuals place the neighborhood at opening businesses at increased risk for outbreaks.
- A pervasive presence of firearms and other weapons has been well-documented.
- Ongoing violations of the Seattle Parks and Recreation's Code of Conduct have been observed, including camping and parking in the park, conduct that unreasonably deprives others of the use of parks, disrupting Seattle Parks and Recreation business, dumping trash and/or creating unsanitary conditions or health hazards that violate public health rules; behaviors that impede restroom use; urinating or defecating, except in designated restroom fixtures, blocking entrances, exits, fire exits, disabled access areas, public walkways; conduct that creates an unreasonable and substantial risk of harm to any person or property; and abusive and harassing behavior; and

MORGAN LEWIS & BOCKIUS LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL. (206) 407-2200   FAX, (206) 407-2224

81.     Despite having knowledge of exactly what was happening at CHOP by being there every day and in regular contact with area residents and business owners, including Plaintiff, the City acted with deliberate indifference toward the safety and property interests of Plaintiff and those other residents and businesses. Evidence of that deliberate indifference includes the following:

a.      The City deliberately and actively chose to preserve and facilitate the occupation, through the various means described throughout this complaint, at the expense of individuals living and working in the neighborhood, including Plaintiff.

b.      The City kept its own employees out of the area as much as possible, fearing for their safety, but left individuals who lived and worked in the neighborhood, including Plaintiff, to fend for themselves with no police response.

82.     The City also enabled the blocking of ingress and egress for businesses and residents in the area, without providing Plaintiff any notice of this deprivation or opportunity to be heard on the matter. The City reached an informal agreement with CHOP participants to provide dozens of concrete barriers to allow limited one-way access on Eleventh and Twelfth Avenues starting on June 16, 2020 (Plaintiff was not invited to participate in these negotiations, and the agreement for limited access failed when CHOP participants moved barriers to block streets that were supposed to be open). The City also declared the streets and sidewalks adjacent to Plaintiff's business as a site for collection of garbage and human waste, without providing Plaintiff notice or an opportunity to comment.

83.     At the same time the City acted with deliberate indifference to Plaintiff and other property owners and people who live and work in or near CHOP, the City physically aided, endorsed, and actively encouraged CHOP participants to continue their occupation of public spaces.

84.     The City physically aided CHOP participants in their occupation of the area in at least the following ways:

COMPLAINT - 26

**MORGAN LEWIS & BOCKIUS LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

a.      When the City abandoned the East Precinct on June 8, 2020, it left behind the barriers that had previously blocked street access and protected the East Precinct from protesters. These barriers foreseeably served as the raw materials that allowed CHOP participants to block streets and create CHOP within a very short time.

b.      On June 16, 2020, the City provided even more concrete barriers to CHOP participants so that CHOP participants could replace wooden barriers and fortify their blockages of streets.

c.      The City provided portable toilets and wash stations for CHOP participants.

d.      The City provided medical equipment, including beds, people movers, and other supplies, to the CHOP "medical tent."

e.      The City provided nighttime lighting at Cal Anderson Park.

f.      The City allowed people encamped in Cal Anderson Park to use the hose bibb for private use.

g.      The City placed speed bumps around the area along with "local access" signs designed to keep people from visiting the area, and even went so far as to tell internet map companies that they should route people seeking online directions to drive out of their way to avoid the area.

h.      The City provided garbage service to groups occupying the area and Cal Anderson Park both during and after CHOP.

85.      The City provided this physical assistance to CHOP despite being aware that doing so would likely encourage and allow CHOP to exist and persist longer than it would have without that assistance.

86.      As  the City admitted in Mayor Durkan's July 1, 2020 emergency order, the City "facilitated" CHOP by:

"*      Providing basic hygiene, water, litter, and garbage removal.

*      Temporarily allowing obstructions of public parks, streets, and sidewalks.

COMPLAINT - 27

1           \*       Modifying SPD and SFD response protocols. . . .

2           \*       Modifying streets and pedestrian access routes.

3           \*       Providing social services outreach and engagement. . . .

4           \*       Facilitating modified city services delivery to local residents and businesses

5                     impacted by events in this area."

6        87.     The City's policies effectively authorized the actions of the CHOP participants. The City communicated clearly to CHOP participants that they could indefinitely continue occupying the streets in the area, maintaining their barricades, and blocking traffic, all without interference from the City. The City communicated that message in at least the following ways:

        a.     On June 11, 2020, during a joint press conference with the Chief of Police, Mayor Durkan stated: "There's not a specific date . . . because we are trying to do things that are responsible."

        b.     On June 12, 2020, in response to a direct question from CNN's Chris Cuomo about how long the City would allow CHOP participants to continue to occupy the neighborhood, Mayor Durkan responded, "I don't know. We could have the Summer of Love."

        c.     On June 16, 2020, the City announced through an official statement from Mayor Durkan that it had negotiated with CHOP participants to adjust some but not all of their barriers to allow one-way traffic on Twelfth Avenue.[4] This agreement was an endorsement of CHOP participants' other barriers and its overall occupation of the neighborhood.

        d.     In announcing the supposed opening of a one-way corridor, the City made clear in a statement from the Mayor that it was an active participant in maintaining and solidifying CHOP barriers and boundaries:

---

[4] https://durkan.seattle.gov/2020/06/city-of-seattle-responds-to-the-capitol-hill-organized-protest/

MORGAN LEWIS & BOCKIUS LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

> The City is committed to maintaining space for community to come together, protest and exercise their first amendment rights. Minor changes to the protest zone will implement safer and sturdier barriers to protect individuals in this area, allow traffic to move throughout the Capitol Hill neighborhood, ease access for residents of apartment building in the surrounding areas, and help local businesses manage deliveries and logistics. [emphasis added][5]

e. Also on June 16, 2020, Mayor Durkan indicated that the City agreed that police officers will only enter the occupied area for "significant life-safety issues."[6]

f. On June 22, 2020, Mayor Durkan and Chief Best held a joint press conference in which they expressed concern about the impacts of CHOP but also indicated at that time there was no specific timeline or plan for lessening those impacts or removing the blockades, barriers, and tents from CHOP.

88. The City also made numerous statements indicating that it endorsed and would continue to support what CHOP participants were doing in the area, thereby ensuring the continued and indefinite occupation and blockading of the neighborhood, and all the damage it had caused and will cause. The City's statements include at least the following:

a. On June 11, 2020, Mayor Durkan posted the following on her Twitter page: "The Capitol Hill Autonomous Zone #CHAZ is not a lawless wasteland of anarchist insurrection – it is a peaceful expression of our community's collective grief and their desire to build a better world."

b. On June 11, 2020, Mayor Durkan also posted on her Twitter page: "For the thousands of individuals who have been on Capitol Hill, I think you've seen what I've seen: the painting of Black Lives Matter along Pine Street, food trucks, spaghetti potlucks, teach-ins, and movies."

c. On June 11, 2020, Mayor Durkan stated during a joint press conference with

---

[5] https://durkan.seattle.gov/2020/06/city-of-seattle-responds-to-the-capitol-hill-organized-protest/
[6] https://durkan.seattle.gov/2020/06/city-of-seattle-responds-to-the-capitol-hill-organized-protest/

COMPLAINT - 29

MORGAN LEWIS & BOCKIUS LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

the Chief of Police:

> Lawfully gathering and expressing first Amendment rights, and demanding we do better as a society, and providing true equity for communities of color, is not terrorism. It is patriotism. The right to challenge government and authority is fundamental to who we are as Americans. . . . And for the thousands of individuals who've been on Capitol Hill, many of them, what you'll see is a painting of Black Lives Matter along Pine Street. Food trucks, spaghetti potlucks, teach-ins, movies, free granola bars . . . .

d.      During the same press conference on June 11, 2020, Mayor Durkan also stated:

> The Capitol Hill area—in fact, some of my family is up there right now— . . . it is not an armed ANTIFA militia no-go zone. It is, a number of people are there, we've had ongoing communications with them, with the businesses, with the residents, and we will make sure that we find some way for people to continue to protest peacefully while also getting ingress and egress. We've had blocks of Seattle in Capitol Hill shut down every summer for everything from Block Party to Pride. This is not really that much of an operational challenge. But we want to make sure that the businesses and residents feel safe and we'll continue to move that forward.

e.      During her Facebook Live interview, Mayor Durkan also stated, "I was up there today, walking around, talking to people, and I think we just have to continue to listen to people and figure out a way that there's still a way for people to have that kind of free expression, but we need to open up the streets, too, at least 12th so we can get fire through, and like that, so we're going to keep talking to people and listening to them. But I heard a lot of great ideas and I heard a lot of community strength there. That was cool."

f.      Also on June 12, 2020, during her interview with CNN's Chris Cuomo, Mayor Durkan said, "We've got four blocks in Seattle that . . . is more like a block party atmosphere. It's not an armed takeover. It's not a military junta. We will – we will make sure that we can restore this. But we have block parties and the like in this part of Seattle all the time. It's known for that."

COMPLAINT - 30

MORGAN LEWIS & BOCKIUS LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

g.      On June 12, 2020, Mayor Durkan endorsed the gardens being planted in Cal Anderson Park on Twitter: "Earlier today I visited the #CHAZ and met Marcus Henderson, the person behind the new community garden popping up in Cal Anderson Park. Read more about Marcus and the work that's gone into creating the gardens: thestanger.com/slog/2020/06/1."

h.      Mayor Durkan also tweeted on June 12, 2020: "For as long as I can remember, Capitol Hill has been autonomous – it's been a place where people go to express themselves freely. Today at the #CHAZ, I spoke with organizers and community about how we can move forward and keep our communities safe, together."

i.      Mayor Durkan tweeted on June 16, 2020: "The #CHOP has emerged as a gathering place for community to demand change of their local, state, and federal government."

j.      On June 19, 2020, Mayor Durkan officially declared that there was no longer a state of emergency in the City because "demonstrations since that day have been and continue be largely peaceful."

k.      On June 21, 2020, after two people were shot in CHOP and one of them died, Mayor Durkan issued a statement indicating that the City still had no plans to cease supporting CHOP and that the City was instead acting to work with and preserve CHOP.

89.    The City officially ended CHOP on July 1, 2020, by clearing CHOP of barricades and encampments. However, as explained above, the City's earlier assistance and endorsement of CHOP and CHOP participants continued to cause harm to Plaintiff that would not have occurred absent the City's actions. This included:

a.      The reoccupation of Cal Anderson Park after July 1, 2020, and the continued failure by the City to properly address the violence, crime, vandalism, and overall danger created by that reoccupation prior to December 16, 2020.

b.      Continued nightly and daily, unpermitted protests and blocking of streets

COMPLAINT - 31

throughout the last half of 2020 as a result of the City having created the perception that protests and blocked access would be allowed in the neighborhood that had housed CHOP. Police often did not respond to or attempt to stop crime associated with these protests.

c.      Erection of a bunker that completely enveloped the sidewalks around the East Precinct, confirming to the public that the City considered the neighborhood to be unsafe, and furthering the reputation for unrest and decreased safety that had already been created by the City's actions with regard to CHOP.

## V.      CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION – SUBSTANTIVE DUE PROCESS

42 U.S.C. § 1983

U.S. Const. Amend. XIV § 1

90.      Plaintiff incorporates all other allegations in this complaint as if set forth fully herein.

91.      Plaintiff has a right pursuant to substantive due process to be protected from state-created dangers.

92.      The City's actions, assistance, endorsements, and encouragements of CHOP and CHOP participants greatly increased the likelihood of property damage, loss of business revenue, loss of use of property, and other damage to Plaintiff. This subjected Plaintiff to harm that it would not have suffered absent the City's actions.

93.      The City knew, by virtue of communications it had received from Plaintiff in and after June 2020, that Plaintiff was suffering particularized harm caused by CHOP and its aftermath. The City knew that if it did not change its approach to CHOP and its aftermath, that Plaintiff would continue to suffer particularized harm.

94.      All damages suffered by Plaintiff were foreseeable, known, and obvious. Numerous officials at the City foresaw that its actions would increase crime and harm to businesses in the area. The City also knew of the harm that was being suffered by Plaintiff specifically and did not

COMPLAINT - 32

1    change its actions despite the fact it was foreseeable that absent change, that harm would continue.

2    It was also foreseeable that the City's actions with regard to CHOP would continue to reverberate

3    throughout the neighborhood and for Plaintiff after CHOP was disbanded, especially with any

4    unchecked reoccupation of Cal Anderson Park. This was, moreover, all objectively foreseeable.

5        95.    The City acted with deliberate indifference to the known and obvious harm that

6    would be suffered by Plaintiff. The City knew that if it did not change its approach to CHOP and

7    its aftermath, that Plaintiff would continue to suffer particularized harm but the City chose to delay

8    clearing out CHOP from Cal Anderson Park and the surrounding area, and then chose to not clear

9    out the reoccupation of that park, directly across the street from Plaintiff, until December 2020.

10   This was despite numerous communications between Plaintiff and City representatives about the

11   harm Plaintiff was suffering, including Plaintiff's submission of a claim form to the City seeking

12   recompense for damages it had suffered and was still suffering.

13       96.    The City did so pursuant to City policy as created and ratified by City policymakers,

14   including Mayor Durkan.

15   **SECOND CAUSE OF ACTION – TAKING**

16   <u>42 U.S.C. § 1983</u>

17   <u>U.S. Const. Amends. V, XIV</u>

18       97.    Plaintiff incorporates all other allegations in this complaint.

19       98.    Plaintiff has constitutionally protected property rights to use and enjoy its property,

20   to exclude others from its property, and to access its property via public rights-of-way.

21       99.    The City deprived Plaintiff of those rights by affirmatively creating, assisting,

22   endorsing, and encouraging an indefinite, unpermitted invasion, occupation, and blockade of the

23   public rights-of-way that provide access to Plaintiff's business location, as well as by affirmatively

24   creating, assisting, endorsing, and encouraging the physical invasion of Plaintiff's property by

25   CHOP participants.

26       100.   The City's actions impeded or impaired access to Plaintiff's business by customers,

COMPLAINT - 33

1  employees, and suppliers.

2      101.   The City also committed a *per se* takings by creating a government-authorized

3  invasion of Plaintiff's leasehold.

4      102.   The City did so pursuant to City policy as created and ratified by City policymakers,

5  including Mayor Durkan.

6      103.   Plaintiff has not received compensation for the deprivation of its property rights.

7      104.   The City's actions constitute an unlawful taking for private use and/or an unlawful

8  taking for public use without just compensation, which has caused Plaintiff economic harm,

9  including through a loss of business revenue.

10              **THIRD CAUSE OF ACTION – NEGLIGENCE**

11      105.   Plaintiff incorporates all other allegations in this complaint.

12      106.   The City's affirmative acts as described in this complaint placed Plaintiff at high

13  and unreasonable risk of foreseeable harm, including but not limited to property damage, lost

14  income and revenue, excessive noise, public safety hazards, vandalism, and decreased or lost

15  access.

16      107.   The City had a duty to protect Plaintiff from that foreseeable harm.

17      108.   The City breached its duty to protect Plaintiff from that foreseeable harm.

18      109.   The City also owed Plaintiff a duty pursuant to the Fire Code, which required

19  clearing of the public streets, and the Seattle Municipal Code, which required the City to protect

20  Plaintiff from unreasonable risks of property damage and other harm and dangers by designating

21  an alternate proposal for those who wished to create and participate in CHOP and otherwise occupy

22  Cal Anderson Park during 2020.

23      110.   The City also breached the duty created by the Fire Code and the Seattle Municipal

24  Code by not implementing the required procedures, processes, and protections.

25      111.   The City's breach of its duties proximately caused harm to Plaintiff including but

26  not limited to property damage, lost income and revenue, exposure to excessive noise and public

COMPLAINT - 34

safety hazard, and increased expenses for vandalism.

## FOURTH CAUSE OF ACTION – NUISANCE

RCW 7.48.010, et. seq.

112.    Plaintiff incorporates all other allegations in this complaint.

113.    As a direct result of the City's affirmative acts, foot and vehicular traffic on the public streets, sidewalks, and other rights-of-way surrounding Plaintiff's business were physically blocked and/or impeded.

114.    The blocking and impeding of foot and vehicular traffic substantially and unreasonably interfered with Plaintiff's business and has caused harm to Plaintiff, including resulting in lost revenues.

115.    In addition to blocking public rights-of-way, the City's actions during and following CHOP created and maintained a series of unlawful and/or unreasonable conditions, including excessive noise, public safety hazards, vandalism, and poor health and sanitation conditions.

116.    The City directly participated in the creation and maintenance of this nuisance, including by providing concrete barriers to be used for this specific purpose to the CHOP participants and designating the intersection of Eleventh and Olive as a hub for garbage services and portable toilets to service individuals occupying the neighborhood and Cal Anderson Park.

117.    These conditions annoyed, injured, and endangered the comfort, repose, health, and safety of Plaintiff, and rendered Plaintiff insecure in the use of its properties.

118.    These conditions substantially and unreasonably interfered with Plaintiff's use and enjoyment of its properties, including by creating a reasonable fear by Plaintiff, and caused harm to Plaintiff, including by inflicting property damage and causing lost revenues.

## VI.    JURY DEMAND

Plaintiff demands a trial by jury.

**MORGAN LEWIS & BOCKIUS LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1

## VII.   **PRAYER FOR RELIEF**

2      WHEREFORE, Plaintiff requests the following relief:

3      A.      Judgment in favor of Plaintiff and against Defendant for actual damages in an

4 amount to be proven at trial;

5      B.      Prejudgment interest at the maximum rate allowed by law;

6      C.      Plaintiff's costs of investigation, costs of suit, and reasonable attorneys' fees; and

7      D.      All such other and further monetary, injunctive, and declaratory relief as the Court

8 may deem just and proper.

9      DATED this 6th day of April, 2023.

10                                  **MORGAN, LEWIS & BOCKIUS LLP**

11
                                   By*/s Angelo J. Calfo*
12                                     Patricia A. Eakes, WSBA #18888
                                       Angelo J. Calfo, WSBA #27079
13                                     Tyler S. Weaver, WSBA #29413
                                       Gabriel Reilly-Bates, WSBA #52257
14                                     1301 Second Avenue, Suite 2800
                                       Seattle, WA  98101
15                                     Phone:  (206) (206) 274-6400
                                       Fax:     (206) 407-2224 (206) 274-6401
16                                     Email:  patty.eakes@morganlewis.com
17                                                  angelo.calfo@morganlewis.com
                                                    tyler.weaver@morganlewis.com
18                                                  gabriel.reillybates@morganlewis.com

19

20                                     *Attorneys for Plaintiff 3Pak, LLC, d/b/a Oma Bap*

21

22

23

24

25

26

**MORGAN LEWIS & BOCKIUS LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200  FAX, (206) 407-2224