THE HONORABLE THOMAS S. ZILLY

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| 3PAK, LLC, d/b/a OMA BAP, | Case No. 2:23-cv-00540-TSZ |
| Plaintiff, | OPPOSITION TO CITY OF SEATTLE'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT |
| vs. | |
| CITY OF SEATTLE, | **Noted: June 9, 2023** |
| Defendant. | |

OPPOSITION TO CITY OF
SEATTLE'S MOTION TO DISMISS
(Case No. 2:23-cv-00540-TSZ)

**MORGAN, LEWIS & BOCKIUS LLP**
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................ 1

II.    BACKGROUND ................................................................................. 1

III.   ARGUMENT ..................................................................................... 4

    A.    Standard of Review .................................................................. 4

    B.    Plaintiff's Substantive-Due-Process Claim Should Not Be Dismissed ................ 4

         1.    Plaintiff plausibly alleges the City's affirmative acts created an actual, particularized danger Plaintiff would not have otherwise faced. ................................................ 4

         2.    Plaintiff has more than adequately alleged deliberate indifference. .......... 9

         3.    Plaintiff does not state a separate substantive-due-process claim against the City based on its post-CHOP actions..................................... 11

    C.    Plaintiff Has Stated a Takings Claim ................................................. 11

         1.    Plaintiff has stated a per se takings claim because the city effectively destroyed Plaintiff's right to exclude third-parties from Plaintiff's property. ......................................... 12

         2.    Plaintiff has also stated a lack of access takings claim as even temporary disruptions are actionable. ...................................... 13

         3.    The court should not certify any takings issues to the Washington Supreme Court because federal constitutional law governs the issue.................................................. 16

    D.    Plaintiff's Negligence Claim Should Not Be Dismissed. .................................... 18

    E.    The Court Should Not Dismiss Plaintiff's Nuisance Claim ............................... 21

IV.   CONCLUSION.................................................................................... 23

PLAINTIFF'S OPPOSITION TO CITY OF
SEATTLE'S MOTION TO DISMISS
(Case No. 2:23-cv-00540-TSZ) - i

**MORGAN, LEWIS & BOCKIUS LLP**
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arkansas Game & Fish Comm'n v. United States*,
   568 U.S. 23, 133 S. Ct. 511 (2012)..................................................................15, 16, 17, 18

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...............................................................................................................4

*Atherton Condo. Apartment-Owners Ass'n Bd. of Directors v. Blume Dev. Co.*,
   115 Wash. 2d 506 (1990).....................................................................................................23

*Bailey v. Town of Forks*
   [108 Wash. 2d 262 (1988), *amended,* 753 P.2d 523 (Wash. 1988)]...................................21

*Campbell v. City of Bellevue*,
   85 Wash. 2d 1 (1975)...........................................................................................................21

*Cedar Point Nursery v. Hassid*,
   210 L. Ed. 2d 369, 141 S. Ct. 2063 (2021)...........................................................13, 14, 15, 18

*Collins v. City of Harker Heights, Tex.*,
   503 U.S. 115 (1992).............................................................................................................11

*Donohue v. State*,
   135 Wash. App. 824 (2006).............................................................................................20, 22

*Ehrhart v. King Cnty.*,
   195 Wash. 2d 388 (2020)................................................................................................19, 21

*Goldmark v. McKenna*,
   172 Wash. 2d 568 (2011).....................................................................................................20

*Gorman v. Pierce Cnty.*,
   176 Wash. App. 63 (2013)..............................................................................................19, 20

*Haberle v. Troxell*,
   885 F.3d 170 (3d Cir. 2018).................................................................................................11

*Hernandez v. City of San Jose*,
   897 F.3d 1125 (9th Cir. 2018) .......................................................................................5, 6, 9

*Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*,
   542 F.3d 529 (6th Cir. 2008) ...............................................................................................11

**MORGAN, LEWIS & BOCKIUS LLP**
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

*Hunters Cap., LLC v. City of Seattle*,
   499 F. Supp. 3d 888 (W.D. Wash. 2020)............................................................14, 21

*Hunters Capital LLC v. City of Seattle*,
   2023 WL 184209 (W.D. Wash., Jan. 13, 2023).......................................... *passim*

*Johnson v. City of Seattle*,
   474 F.3d 634 (9th Cir. 2007) ..............................................................................6, 7

*Keiffer v. King Cnty.*,
   89 Wash.2d 369, 572 P.2d 408 (1977)................................................................15, 17

*Lewis v. Krussel*,
   101 Wash. App. 178 (2000)..........................................................................................23

*Livingston v. City of Everett*,
   50 Wash. App. 655 (1988)...........................................................................................21

*Lombardi v. Whitman*,
   485 F.3d 73 (2d Cir. 2007).........................................................................................11

*Lucas v. S.C. Coastal Council*,
   505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed. 2d 798 (1992)......................................15

*Martinez v. City of Clovis*,
   943 F.3d 1260 (9th Cir. 2019) ...............................................................................5, 10

*Matican v. City of New York*,
   524 F.3d 151 (2d Cir. 2008)........................................................................................11

*Munger v. City of Glasgow Police Dep't*,
   227 F.3d 1082 (9th Cir. 2000) .....................................................................................9

*Murr v. Wisconsin*,
   582 U.S. 383, 137 S. Ct. 1933, 198 L. Ed. 2d 497 (2017).......................................14

*Mustoe v. Ma*,
   193 Wash. App. 161 (2016).........................................................................................23

*Northstar Fin. Advisors, Inc. v. Schwab Invs.*,
   904 F.3d 821 (9th Cir. 2018) .......................................................................................4

*Orion Corp. v. State*,
   109 Wash. 2d 621, 747 P.2d 1062 (1987), *abrogated on other grounds by*
   *Chong Yim v. City of Seattle*, 194 Wash. 2d 651, 451 P.3d 675 (2019) .................16

*Sinclair v. City of Seattle*,
   61 F.4th 674 (9th Cir. 2023) ............................................................. *passim*

PLAINTIFF'S OPPOSITION TO CITY OF
SEATTLE'S MOTION TO DISMISS
(Case No. 2:23-cv-00540-TSZ) - iii

**MORGAN, LEWIS & BOCKIUS LLP**
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

*Thompson v. Paul*,
547 F.3d 1055 (9th Cir. 2008) ...................................................................................19

*U.S. Oil Trading, LLC v. State, Off. of Fin. Mgmt.*,
159 Wash. App. 357 (2011) .......................................................................................22

*Vandevere v. Lloyd*,
644 F.3d 957 (9th Cir. 2011) ....................................................................................15

*White v. Minneapolis*,
2021 WL 5964554 (D. Minn. Dec. 16, 2021)................................................6, 7, 9

*Wood v. Ostrander*,
879 F.2d 583 (9th Cir. 1989) .................................................................................5, 9

**Statutes**

Local Law Certificate Procedures Act, Wash. Rev. Code §§ 2.60.010–900 ...............................18

Seattle Municipal Code § 15.52................................................................................21, 22

Seattle Municipal Code § 15.90.002.............................................................................22

**Other Authorities**

https://www.seattle.gov/sdci/codes/codes-we-enforce-(a-z)/fire-
code#2015seattlefirecode (last visited May 30, 2023) .............................................20

Rule 12(b)(6).............................................................................................................4

Rules of Appellate Procedure 16.16 ..........................................................................18

U.S. Constitution Fifth and Fourteenth Amendments ..........................................14, 15

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

## I.    INTRODUCTION

As the Court is well aware from prior litigation, in June 2020, the City of Seattle ("City") facilitated, endorsed, and aided a violent occupation of Cal Anderson Park and the neighborhood immediately adjacent to it. This case is about what the City's affirmative acts meant for Plaintiff, a restaurant across the street from Cal Anderson Park whose access was blocked and business was crippled – with the City's full and contemporaneous knowledge – both during and after that occupation.

The City has moved to dismiss all of Plaintiff's claims. This includes Plaintiff's nuisance and takings claims, which are equivalent to claims that the Court declined to dismiss just a few months ago in *Hunters Capital LLC v. City of Seattle*, 2023 WL 184209, *6-*7 (W.D. Wash., Jan. 13, 2023).

The City's motion also includes Plaintiff's substantive-due-process claim, even though the Ninth Circuit even more recently ruled, in *Sinclair v. City of Seattle*, 61 F.4th 674 (9th Cir. 2023), that businesses such as Plaintiff have viable substantive-due-process claims on the facts of this case. The Ninth Circuit's decision effectively overrules this Court's summary judgment ruling in *Hunters*, and Plaintiff therefore urges the Court to follow *Sinclair.*

The City's motion also includes Plaintiff's negligence claim, which is functionally identical, for present purposes, to the claim the Court dismissed in *Hunters*. Plaintiff asks that the Court reconsider the conclusion reached in *Hunters*, including its application of the public-duty doctrine, and allow Plaintiff's claim to proceed in this case.

The Court should deny the City's motion in its entirety.

## II.    BACKGROUND

### A.    Plaintiff 3Pak, LLC, d/b/a Oma Bap

Plaintiff 3Pak, LLC, d/b/a Oma Bap, is a fast-casual Korean restaurant located at 1640 Eleventh Avenue in Seattle, Washington.  Dkt. 1, Complaint at ¶ 14.[1] This location is at the

---

[1] All "¶" references are to Dkt. 1, the Complaint.

OPPOSITION TO CITY OF
SEATTLE'S MOTION TO DISMISS
(Case No. 2:23-cv-00540-TSZ) **- 1**

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

corner of Eleventh and Olive, directly across the street from Cal Anderson Park. ¶¶ 61, 65.

### B.    The Creation of CHOP

On June 8, 2020, in the face of large protests in Capitol Hill, the City abandoned the East Precinct and ceded control of the surrounding neighborhood, and dozens of police barricades, to protesters. ¶¶ 18-19. Within hours, the protesters had blocked off public streets and sidewalks using the City's barricades and declared the area a police-free eventually known as "CHOP," and which encompassed Plaintiff's location. ¶¶ 20-22. For the next 23 days, this area was occupied by thousands of people who lived in, blocked, and occupied the public streets, sidewalks, and parks at all hours, maintained their own "security" forces, and vandalized local properties. ¶¶ 23-39.

This caused serious harm to Plaintiff as described in section II.E, *infra*, and was done with the City's full knowledge and active facilitation, as described in sections II.B, C, and D, *infra*.

### C.    The City Facilitated CHOP

As the City has openly admitted, it facilitated CHOP by, among other things, (1) providing CHOP participants with public restrooms, wash stations, water, electricity, and garbage service, (2) "allowing" CHOP participants to "obstruct[] public parks, streets, and sidewalks," (3) keeping police and fire out of the area by "modifying . . . response protocols," (4) "modifying streets and pedestrian access routes," (5) providing social services to CHOP participants, and (6) "modif[ying] city services delivery ...." ¶ 86. The City kept the lights on at Cal Anderson Park for the people who declared it their new home and provided them with daily garbage service and access to water. ¶¶ 84.e, f, h. The City provided supplies to CHOP's makeshift volunteer "medical tent." ¶ 84.d. The City even provided "sturdier" barriers to fortify CHOP's boundaries and agreed that CHOP could block streets. ¶¶ 84.b, 89.b. The City even declared the area "local access" only and told map companies to route drivers away from the area. ¶ 84.g.

**D.    The City Endorsed and Encouraged CHOP Despite Full Knowledge It Was Harming Area Businesses**

The City also actively encouraged and endorsed CHOP's existence. Then-Mayor Jenny Durkan and then-Police Chief Carmen Best repeatedly stated that the City had no plan to clear CHOP. ¶87.  Mayor Durkan compared CHOP to the Summer of Love, tweeted endorsement of illegal gardens dug into Cal Anderson Park, and declared CHOP was "not a lawless wasteland" and repeatedly compared the occupation to a block party. ¶¶ 87.b, 88.

These statements were made at the same time the Mayor and the City knew that Cal Anderson had been overrun by violent protesters and that CHOP was causing serious harm to businesses in the area. ¶¶ 40-60. The City had high-ranking representatives in the area every day observing what was happening. ¶¶ 78, 79, 81. Chief Best was clear in her public news briefings that crime was spiking in the area without any public response, ¶¶ 44, 50, 79.a, g, h, as did Mayor Durkan. ¶ 79.f.  There were also prominent homicides in CHOP that police and medics were unable to respond to, with the full knowledge of City executives. ¶¶ 46-56.

**E.    Plaintiff was Particularly Harmed, With Full City Knowledge**

Plaintiff's location at Eleventh and Olive meant that it was especially impacted by the City's actions. Access to Plaintiff's business was impeded not only by barriers placed at the intersection outside its front door, the City decided Eleventh and Olive would be the primary location for the numerous public toilets and dumpsters that the City provided to CHOP occupiers. ¶¶ 61-65, 68. This situation created access problems for employees, suppliers, and customers through and after CHOP. *Id.* The result was extensive vandalism, a huge decrease in business, thefts, cancellation of revenue-generating events, and closures. ¶¶66-72.

The City knew about all of this, as it was happening, in June 2020 and later.  Plaintiff had extensive discussions with City officials, at least one of whom then emailed summaries of those conversations widely across City management. ¶¶ 73-74. Two of those City officials actually admitted the City was in the wrong, but the City offered Plaintiff just $500, forcing this lawsuit. ¶¶ 74-75.

**MORGAN, LEWIS & BOCKIUS LLP**
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

### III.   ARGUMENT

**A.   Standard of Review**

When considering a motion to dismiss pursuant to Rule 12(b)(6), a court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to [the plaintiff]." *Northstar Fin. Advisors, Inc. v. Schwab Invs.*, 904 F.3d 821, 828 (9th Cir. 2018). While the Court should review the claims to determine whether they are plausible, that standard is met whenever "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**B.   Plaintiff's Substantive-Due-Process Claim Should Not Be Dismissed**

The City asks the Court to dismiss Plaintiff's substantive-due-process claim based largely on the Court's prior ruling on summary judgment in the *Hunters* case but fails to acknowledge that the Ninth Circuit has *de facto* overruled the Court's *Hunters* order in *Sinclair v. City of Seattle*, 61 F.4th 674 (9th Cir. 2023).  As explained below, while the Ninth Circuit ruled against the plaintiff in that case, it made clear that the allegations in this case are more than adequate to state a substantive-due-process claim.

**1.   Plaintiff plausibly alleges the City's affirmative acts created an actual, particularized danger Plaintiff would not have otherwise faced.**

The City claims Plaintiff has not alleged that the City's facilitation of CHOP exposed Plaintiff to a particularized danger that it would not have otherwise faced. That is incorrect. The City both overstates the standard and ignores that the City knew *precisely* what was happening to Plaintiff as it was happening, yet continued to facilitate CHOP despite knowing Plaintiff would continue to be harmed.

In determining whether the City's actions created an actual, particularized danger, the question is whether the City put Plaintiff "in a situation that was more dangerous" than the one that would have existed absent the City's actions. *Martinez v. City of Clovis*, 943 F.3d 1260,

OPPOSITION TO CITY OF
SEATTLE'S MOTION TO DISMISS
(Case No. 2:23-cv-00540-TSZ) - 4

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

1271 (9th Cir. 2019).  This does not require that Plaintiff was the *only* entity that the City placed in a more dangerous situation; all that is required is that is there is something that differentiated Plaintiff "from the general public." *Wood v. Ostrander*, 879 F.2d 583, 590 (9th Cir. 1989). *See also Sinclair*, 61 F.4th at 682 (danger is sufficiently particularized if it poses "a specific risk" to a particular plaintiff, as opposed to the public in general).

For example, in *Hernandez v. City of San Jose*, 897 F.3d 1125 (9th Cir. 2018), the plaintiffs were among thousands of people who had attended a Trump rally at the San Jose Convention Center that generated a large crowd of extremely hostile and violent counter-protesters outside the rally. *Id.* at 1129-30. After the rally concluded, officers required rally attendees to exit the facility via doors that would require them to walk through the violent protesters, rather than through alternative exits. *Id.* As a result, some of the rally attendees were severely injured as they attempted to leave. *Id.* Although officers could not have known exactly who among the large crowd of rally attendees would be injured, or how, or by whom, the Ninth Circuit ruled that this was an adequately particularized increased risk of harm to support a substantive-due-process claim.  *Id.* at 1133-34.

The situation alleged in this case is parallel to *Hernandez*. The City knew when it facilitated CHOP that its actions were creating an increased risk of harm to a fixed set of businesses and properties in the area in and adjacent to CHOP. II.C, *supra*. The City openly acknowledged as much in numerous public statements at the time, *id*, yet it continued to facilitate the neighborhood's occupation. II.C, D, *supra*. This is more than enough to satisfy the particularity standard in the Ninth Circuit, especially as clarified by *Hernandez*.

The Court disagreed on summary judgment in *Hunters*. The Court concluded that the City's facilitation of CHOP was analogous to the situation in *Johnson v. City of Seattle*, 474 F.3d 634 (9th Cir. 2007) and *White v. Minneapolis*, 2021 WL 5964554 (D. Minn. Dec. 16, 2021), where officers acted passively and did not affirmatively place the plaintiffs in a more dangerous situation. *Hunters Capital LLC v. City of Seattle*, 2023 WL 184209, *6-7 (W.D. Wash., Jan. 13,

OPPOSITION TO CITY OF
SEATTLE'S MOTION TO DISMISS
(Case No. 2:23-cv-00540-TSZ) - 5

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

2023). The Court concluded affirmative acts such as providing toilets, lighting, and garbage service to CHOP occupiers and placing concrete barriers in the streets to preserve a place for CHOP did not increase the risk of harm to the *Hunters* plaintiffs. *Id.* The Court did not address *Hernandez*.

The Ninth Circuit looked at nearly identical facts in *Sinclair* and reached a different conclusion. In *Sinclair*, the plaintiff was the mother of a non-resident of Capitol Hill who came to the area after the creation of CHOP and was murdered. *Sinclair*, 61 F.4th at 676-78. The victim's mother brought a substantive-due-process claim alleging many of the same City actions as are alleged here and were in *Hunters*. *Id.* The Ninth Circuit ruled as follows:

> Accepting Sinclair's allegations as true, Sinclair shows that the City affirmatively created the actual danger …. Most relevant, … the City (1) left behind barriers the CHOP occupiers used to block streets off from general traffic and emergency responders; (2) provided portable toilets, lighting, and other support to the occupiers that allowed the lawless violence to persist; and (3) lured visitors to CHOP with promises of safety and a block-party atmosphere. Construing these allegations in the light most favorable to Sinclair, it is plausible that these actions, combined with the City's withdrawal of law enforcement from CHOP, incubated a more lawless and violent environment compared to the status quo.

*Id.* at 681 (emphasis added).

The Ninth Circuit also rejected the City's argument that the *Johnson* case governs here, because in this case, unlike *Johnson*, there was affirmative action taken by the City to support CHOP:

> In *Johnson*, in response to growing violence at a Mardi Gras festival, the City … altered its crowd control plan for riot officers monitoring the event … to one in which officers would remain on the periphery of the crowd. ... The City's decision to switch its tactical plan "did not place [the plaintiffs] in any worse position than they would have been in had the police not come up with any operational plan whatsoever." *Id.*

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

1
2
3
4
5
6
7
8

> Here, <u>Sinclair alleges more than the sort of police withdrawal …
> we considered in <i>Johnson</i>. She alleges the City affirmatively
> provided traffic barriers, lighting, and toilets to encourage the
> occupation, and portrayed CHOP as a fun, peaceful, cop-free
> protest, which further incited lawlessness in the area but
> nonetheless attracted Anderson to CHOP. Sinclair also alleges that
> the City support for CHOP extended for about a month after it
> became clear that the City's policies were fostering greater
> unchecked violence. The City's actions were thus deliberate and
> not passive or neutral as in <i>Johnson</i>. Sinclair's allegations against
> the City go further and support the inference that the City's actions
> increased the level of danger CHOP posed to Anderson above the
> counterfactual baseline level of danger that would have existed
> without its intervention.</u>

9    *Id.* at 682 (emphasis added).

10       The Ninth Circuit thus contradicted the Court on whether the City's actions related to
11   CHOP are sufficient to allege affirmative creation of a more dangerous situation than would have
12   existed without those actions. And while *Sinclair* does not address *White*, that case is
13   distinguishable here for the same reasons *Johnson* is; there, the City chose not to respond, and
14   there was no evidence that they had taken affirmative action that increased the danger. 2021 WL
15   5964554, at *1-2, *5.

16       The Ninth Circuit ultimately ruled against Sinclair on the basis that her son was a
17   member of the general public who had come to CHOP, and thus the harm was not sufficiently
18   particularized. *Sinclair*, 61 F.4th at 682-83. However, the Court distinguished businesses such
19   as Plaintiff and the *Hunters* plaintiffs, and discussed this Court's order on the *Hunters* motion to
20   dismiss:

21
22
23
24
25

> Sinclair fails to allege that the City had any previous interactions
> with her son, directed any actions toward him, or even knew of her
> son's existence until he was killed. Instead, she "alleged that the
> City left all visitors to CHOP in a much more dangerous position
> than it found them in." Even construed in the light most favorable
> to Sinclair, her allegations demonstrate that the City-created
> danger was a generalized danger experienced by all those members
> of the public who chose to visit the CHOP zone.

26
27

OPPOSITION TO CITY OF
SEATTLE'S MOTION TO DISMISS
(Case No. 2:23-cv-00540-TSZ) - 7

1

2

3

4

5

6

7

8

> That distinguishes this case from *Hunters Capital LLC v. City of Seattle*, another CHOP case in which the district court held that plaintiffs could state a state-created danger claim. 499 F. Supp. 3d 888, 902 (W.D. Wash. 2020). Both parties point out that *Hunters Capital* involved plaintiffs who lived or owned businesses within the CHOP zone, significantly narrowing the class of persons exposed to the alleged state-created danger. *See id.* at 895–99. <u>Those facts are more like *Hernandez*, where officers directed a discrete and identifiable group of protestors toward a dangerous mob, than like *Johnson*, where plaintiffs were among many who had attended a dangerous Mardi Gras festival voluntarily.</u> While we offer no opinion on *Hunters Capital*, its facts are appreciably closer to meeting the particularity standard that our precedent requires than are Sinclair's allegations.

9

*Id.* at 683 (emphasis added).

10

11

12

13

14

Thus, while the Ninth Circuit did not finally rule that businesses such as Plaintiff are sufficiently particular to support a substantive-due-process claim, the court strongly suggested that they are and that this Court was correct in its ruling on the City's motion to dismiss in *Hunters*. And as discussed above, *Hernandez* has direct parallels to this case, and controls on the question of particularity.[2]

15

16

17

18

19

20

21

22

However, even if this on its own is not enough to demonstrate adequate particularity, it is also evident that the City knew exactly what CHOP was doing to Plaintiff, and knew that Plaintiff would continue the suffer the same harm if the City did not change course, but the City chose to continue its facilitation of CHOP. II.C, D, *infra*. Plaintiff complained directly to City officials about CHOP and those concerns were circulated throughout the City's executive ranks, yet the City did nothing to change its actions. ¶¶ 73-74. In fact, the City's actions directly targeted and harmed Plaintiff by placing the epicenter of the City's public-sanitation facilitation of CHOP directly outside Plaintiff's front door. ¶ 64.

23

24

25

26

27

---

[2] The City also relies, as the Court did in the *Hunters* summary judgment order, on *White* for the notion that a business within a city is not sufficiently "particular" to support a substantive-due-process claim. Mtn. at 5. But in *White*, the problem was that the plaintiff's business apparently could not identify a specific area or group that was in danger more than the entire city of Minneapolis. 2021 WL 5964554 at * 6. Here, by contrast – and just as in *Hernandez* – the allegations concern an easily identifiable if somewhat numerous group of people who would be adversely affected by the City's actions.

OPPOSITION TO CITY OF
SEATTLE'S MOTION TO DISMISS
(Case No. 2:23-cv-00540-TSZ) - 8

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

These additional facts, while not necessary to demonstrate an actual and particularized increased danger of harm to Plaintiff, make it unmistakable that Plaintiff satisfies that standard. As *Sinclair* makes clear, a plaintiff is more likely to satisfy the particularity requirements when government agent interacted with that plaintiff, acted in a way that targeted that plaintiff specifically, and knew of that plaintiff's existence and dangers that plaintiff was exposed to. 61 F.4th at 683. All of that was true here, yet the City left Plaintiff to fend for itself in a hostile environment. This parallels cases such as *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1085-87 (9th Cir. 2000), officers ejected the plaintiff from a bar, wearing only jeans and a t-shirt, into subfreezing winter weather, where he later died of hypothermia, and *Wood*, 879 F.2d at 586, where a trooper abandoned the plaintiff her in a high-crime area where she was subsequently raped.

Plaintiff has alleged the City's affirmative actions created a sufficiently particular risk of harm. Plaintiff respectfully requests that the Court recognize the Ninth Circuit's implicit overruling of the *Hunters* summary judgment order.

### 2.      Plaintiff has more than adequately alleged deliberate indifference.

The City also alleges Plaintiff failed to adequately allege it acted with deliberate indifference, Mtn. at 9, but again misstates the standard and fails to fully acknowledge the Ninth Circuit's contrary ruling in *Sinclair*.

In order to allege deliberate indifference, Plaintiff must plead that the City "disregarded a known or obvious consequence of his action." *Martinez*, 943 F.3d at 1274. "In other words, the state actor must have known that something was going to happen, but 'ignored the risk and exposed the plaintiff to it anyway.'" *Id.* at 1274, *quoting Hernandez*, 897 F.3d at 1135.

Here, Plaintiff has alleged that it was both foreseen and known that CHOP would cause and was causing harm, including as to Plaintiff specifically, and that the City nonetheless pressed on with its facilitation of the occupation. This includes consciously preserving the occupation at the expense of people who would be foreseeably harmed. II.C, D *infra*. It also includes actively

OPPOSITION TO CITY OF
SEATTLE'S MOTION TO DISMISS
(Case No. 2:23-cv-00540-TSZ) - 9

**MORGAN, LEWIS & BOCKIUS LLP**
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

facilitating CHOP in a myriad of ways, from providing portable toilets to supplying CHOP's medical tent, to providing stronger concrete barriers to the occupation, and to abandoning the East Precinct and then keeping police and fire out of the neighborhood for more than three weeks. *Id.* And the City did all this at the same time that the Mayor was on national media comparing CHOP to block parties and the Summer of Love at the same time the Police Chief was making it clear in joint press conferences that crime, including violent crime, had spiked in CHOP. II.D, *infra*. It also includes that the City kept its own employees out of the area due to safety concerns but forced Plaintiff to deal with the problem without assistance. ¶ 79.k.

The Court concluded on summary judgment in *Hunters* that these actions did not give rise a genuine issue of material fact as to whether the City acted with deliberate indifference. 2023 WL 184209 at *8. The Ninth Circuit disagreed:

> <u>Sinclair's allegations support the strong inference that the City acted with deliberate indifference toward the dangers of permitting and encouraging establishment of the CHOP zone</u>. It is self-evident that the SPD's wholesale abandonment of its East Precinct, combined with Mayor Durkan's promotion of CHOP's supposedly festival-like atmosphere, would create a toxic brew of criminality that would endanger City residents. In particular, Sinclair's allegations that "City Council Member Kshama Sawant publicly and recklessly framed CHOP as a 'peaceful' occupation even after it became violent," and that Police Chief Carmen Best wondered aloud after a second homicide in CHOP "why we could continue to allow this to happen," all support the inference that City officials knowingly exposed the public to a danger against which the officials did almost nothing to protect against.

*Sinclair*, 61 F.4th at 681 (emphasis added). The Ninth Circuit also derided the "the City's shocking contempt towards its promise to citizens" in its city charter to provide police protection. *Id.* at 684.

Plaintiff respectfully urges the Court to follow *Sinclair* on this issue.[3] The Ninth Circuit

---

[3] The City's position seems to be that the Court can and should ignore what the Ninth Circuit ruled because that court did not address whether the City had "balanced interests" before acting as it did. Mtn. at 9, n.3. But *Sinclair* could scarcely be clearer on the question of deliberate indifference. And what the City claims to have done is inappropriate on a motion to dismiss, where the focus is on what the complaint alleges, especially given that the

made it clear that the City's actions, as alleged by Plaintiff here and the plaintiff in *Sinclair*, "support the strong inference that the City acted with deliberate indifference toward the dangers of permitting and encouraging establishment of the CHOP zone." *Id.*

### 3. Plaintiff does not state a separate substantive-due-process claim against the City based on its post-CHOP actions.

The City has also moved to dismiss Plaintiff's substantive-due-process claim to the extent Plaintiff claims the City's post-CHOP actions separately give rise to their own claim. Mtn. at 6-8, 9-10. But Plaintiff does not claim that the City's actions from July through December 2020 separately give rise to a substantive-due-process claim. The City's arguments to that end are thus unnecessary to address. However, Plaintiff reserves the right to demonstrate a causal link between its substantive-due-process claim related to CHOP and Plaintiff's post-CHOP harm.

### C.   Plaintiff Has Stated a Takings Claim

Plaintiff alleged in its Complaint that it has constitutionally protected property rights to use and enjoy its property, to exclude others from its property, and to access its property via public rights of way. ¶ 98. Plaintiff alleged that the City deprived Plaintiff of its property rights by:

> "affirmatively creating, assisting, endorse and encouraging an indefinite, unpermitted invasion, occupation and blockade of the public rights-of-way that provide access to Plaintiff's business location, as well as by affirmatively creating assisting, endorsing and encouraging the physical invasion of Plaintiff's property by CHOP participants."

*Id.* at ¶ 99. The specifics of how the City accomplished this are described in detail in Plaintiff's Complaint in ¶¶ 18, 19-22, 40-44, 53-65, 68-70, 73, 77-80, 82-88. Plaintiff also alleged that the

---

City's supposed balancing will be in dispute factually. And none of the City's cases hold that a state actor cannot act with deliberate indifference if there is consideration of competing factors. *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 128 (1992) (not adopting any such limitation; plaintiff had not shown any state actor knew of significant risk plaintiff would be injured); *Matican v. City of New York*, 524 F.3d 151, 159 (2d Cir. 2008) (balancing of interests is a factor to consider in whether actor was deliberately indifferent); *Lombardi v. Whitman*, 485 F.3d 73, 79-81 (2d Cir. 2007) (actual issue was plaintiff's inability to prove affirmative actions); *Haberle v. Troxell*, 885 F.3d 170, 177-78 (3d Cir. 2018) (one consideration in deliberate indifference analysis is the amount of time government actor had to make decision); *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 535-36 (6th Cir. 2008) (same).

OPPOSITION TO CITY OF
SEATTLE'S MOTION TO DISMISS
(Case No. 2:23-cv-00540-TSZ) **- 11**

**MORGAN, LEWIS & BOCKIUS LLP**
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

City's actions above impeded or impaired access to Plaintiff's business by customers, employees, and suppliers.   ¶ 100.  In an emergency order that was issued by the City on July 1, 2020, the City admitted that "the conditions in the Cal Anderson Park area [had] deteriorated to the point where public health, life and safety are threatened by activities in and around the area. . . ." and that the protesters had been "blocking . . .  public walkways" and engaging in "conduct that creates and unreasonable and substantial risk of harm to any person or property; and abusive and harassing behavior."   ¶ 80.   These allegations all state Plaintiff's per se and right of access takings claims.

>    1.    **Plaintiff has stated a per se takings claim because the city effectively destroyed Plaintiff's right to exclude third-parties from Plaintiff's property.**

Plaintiff acknowledges that the Court ruled against the *Hunters* plaintiffs on the issue of this exception, where the Court noted that "[u]nlike in *Cedar Point* and *Loretto*, the City did not adopt a regulation or ordinance granting protesters a 'formal entitlement' to enter Plaintiffs' properties." 2023 WL 184209 at *9.  However, Plaintiff asks that the Court not follow its earlier decision, especially given that this is a motion to dismiss.  The essence of Plaintiff's per se takings claim is that Plaintiff was deprived of the "right to exclude" the CHOP protesters when the City encouraged CHOP and refused to respond to minor property crimes, such as trespass, vandalism, etc.  The Supreme Court in *Cedar Point Nursery v. Hassid*, 210 L. Ed. 2d 369, 141 S. Ct. 2063 (2021) described the "right to exclude" as " 'one of the most treasured'" rights of property ownership, and "one of the most essential sticks in the bundle of rights that are commonly characterized as property."  *Id.* at 2072-73.

The City argues that Plaintiff cannot state a *per se* takings claim because Plaintiff has "not alleged that the *City itself* invaded or interfered with Plaintiff's property." *See* Mtn. at 10 (emphasis added).  But that is not the correct lens with which to view the issue.  In *Cedar Point*, the Supreme Court clarified that a per se taking could occur through a regulation when "the

government has physically taken property for itself *or someone else* – by whatever means – or has instead restricted a property owner's ability to use his own property.  Whenever a regulation results in a physical appropriation of property, a per se taking has occurred and *Penn Central* has no place."  *Id.* at 2072 (emphasis added).  In *Cedar Point*, the Supreme Court held that a per se taking occurred where a regulation compromised the property owners "right to exclude," calling that right "'one of the most treasured' rights of property ownership" even though the governmental entity itself never took control of plaintiff's property.  *Id.* (citation omitted).

Plaintiff has contended that the City authorized third-party physical invasions, and alleged that it essentially lost the right to exclude third parties during CHOP, as the City created a "red-zone" into which it would not go to enforce trespasses by third parties.  *Id.* at ¶ 40-3.  During the CHOP, the City refused to enforce property crime violations such as trespass and / or vandalism on Plaintiff's property, due to its Red Zone policy.  *Id.*  The City's actions effectively vitiated Plaintiff's right to exclude third-parties during CHOP, and Plaintiff suffered broken windows, vandalism, overturned outdoor tables, attempts to steal Plaintiff's outdoor seating, and petty theft of food and beverages as a result of the City's creation of CHOP in combination with its Red Zone policy.  ¶¶ 59, 68, 69.  Plaintiff was forced to close entirely on June 20, 2020, and to close early on other days in 2020 due to the unsafe conditions fostered by the City.  ¶ 70.  This Court has already held that allegations similar to Plaintiff's were sufficient to withstand a motion to dismiss, noting that the City's conduct was "sufficiently direct and substantial to require compensation under the Fifth Amendment."  *Hunters Cap., LLC v. City of Seattle*, 499 F. Supp. 3d 888, 904 (W.D. Wash. 2020).  Plaintiff has adequately stated a per se takings claim.

### 2. Plaintiff has also stated a lack of access takings claim as even temporary disruptions are actionable.

The Takings Clause, which applies to local governments through the Fourteenth Amendment, provides: "[N]or shall private property be taken for public use, without just compensation."  U.S. Const. amend. V; *see also Murr v. Wisconsin*, 582 U.S. 383, 392, 137 S.

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

Ct. 1933, 1942, 198 L. Ed. 2d 497 (2017).  To establish a violation of the Takings Clause, a plaintiff must show that "an independent source such as state law . . . define[s] the range of interests that qualify for protection as 'property' under the Fifth and Fourteenth Amendments." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1030, 112 S.Ct. 2886, 120 L.Ed. 2d 798 (1992) (citation omitted).  Once a state-created property right is established, the Court must then determine "whether [that] property right has been abridged improperly (taken without just compensation) or whether a plaintiff has given up the right to assert such a claim," which are "question[s] of federal law." *Vandevere v. Lloyd*, 644 F.3d 957, 963-64 (9th Cir. 2011).

Plaintiff has a clearly defined property right to its leasehold interest in the restaurant space that it leases (¶ 101), a fact which the Court has already recognized.  *Hunters*, 2023 WL 184209, at *10  ("[l]easehold interests, in addition to ownership interests, are protected property interests under the Takings Clause.").  In addition, an owner's right of access to his or her property is recognized in Washington.  *Id.*, citing *Keiffer v. King Cnty.*, 89 Wash.2d 369, 372–73, 572 P.2d 408 (1977) ("The right of access of an abutting property owner to a public right-of-way is a property right which if taken or damaged for a public use requires compensation.").  To establish a taking under this theory of liability, a plaintiff must show that access to their properties was eliminated or substantially impaired.  *Id.* (citations omitted).  The question of degree of impairment is a question of fact.  *Keiffer*, 89 Wash. 2d at 410.

While the City claims that Washington State law does not recognize takings claims based on temporary or intermittent access disruptions," (Mtn. at 11), Federal Law clearly does.  In *Cedar Point Nursery*, the Supreme Court held that "'compensation is mandated when a leasehold is taken and the government occupies property for its own purposes, even though that use is temporary. . . The fact that a right to take access is exercised only from time to time does not make it any less a physical taking.'"  141 S. Ct. at 2074-75; s*ee also Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 133 S. Ct. 511 (2012) ("temporary interference with private property may give rise to a compensable taking under the Fifth Amendment to the U.S.

Constitution".)  Washington Courts have held that "the federal constitution sets a minimum floor of protection, below which state law may not go."  *See Orion Corp. v. State*, 109 Wash. 2d 621, 652, 747 P.2d 1062, 1079 (1987), *abrogated on other grounds by Chong Yim v. City of Seattle*, 194 Wash. 2d 651, 451 P.3d 675 (2019), and *abrogated by Yim v. City of Seattle*, 194 Wash. 2d 682, 451 P. 3d 694 (2019) (citation omitted).

Washington's "permanent or recurring" rule is almost identical to the state-law based rule invalidated in *Arkansas Game & Fish Comm'n*.  In that case, the U.S. Supreme Court considered whether the U.S. Army Corps of Engineers ("Corps") was liable, under a temporary takings theory, for damage it cause to state-owned property by inundating land with flood waters.  133 S. Ct. at 515 ("The question presented is whether a taking may occur within the meaning of the Takings Clause, when government induced flood invasions, although repetitive, are temporary.")  The Court of Federal Claims found the Corps' actions constituted a taking and awarded the Commission just compensation for the value of the damaged time growing on the land and the cost of restoring the property.  *Id.* at 517.  But the Federal Circuit reversed because it believed that takings liability could only attach to government action that was "permanent or inevitably recurring."  The U.S. Supreme Court rejected that categorical rule and held that the government-induced flooding, although temporary in duration, was not exempt from the Takings Cause.  *Id.* at 522.

The Washington State "permanent or recurring" rule, moreover, does not take into account any of the factors that are essential to the takings inquiry.   Takings claims must typically be adjudicated on their individual merits and are not subject to per se exclusionary rules:

> We have recognized . . . that no magic formula enables a court to judge, in every case, whether a given government interference with property is a taking.  In view of the nearly infinite variety of ways in which government actions can affect property interests, the Court has recognized few invariable rules in this area.

1  *Arkansas Game & Fish Comm'n*, 133 S. Ct. at 518.  Because of that, the Court emphasized that

2  it is "incumbent on courts to weigh carefully the relevant factors and circumstances in each case,

3  as instructed by our decisions." *Id.*

4      Just as in the *Hunters* case, where this court denied the City's motion for summary

5  judgment relating to those plaintiffs' lack of access claims, Plaintiff's allegations concerning the

6  boundaries of CHOP do not defeat Plaintiff's lack of access claim.  The City myopically seizes

7  on Plaintiff's allegation that "initially, the blocked off area extended to all streets within one

8  block of the precinct."  Mtn., 13.  However, in the next two paragraphs, Plaintiff describes the

9  expansion of the CHOP zone to its unofficial boundaries of "East Denny Way, east to 13th

10  Avenue, south to East Pike Street and west to Broadway," which clearly included Plaintiff's

11  location, at 11th and Olive.  ¶¶ 21-22.  Plaintiff alleged in its Complaint that "[a]s a direct result

12  of the City's affirmative acts, foot and vehicular traffic on the public streets, sidewalks, and other

13  rights-of-way surrounding Plaintiff's business were physically blocked and/or impeded." ¶ 113.

14  Moreover, although Plaintiff acknowledged that the City secured "one-way access on Eleventh

15  and Twelfth Avenues" that does not mean that access was not still "substantially impaired" by

16  CHOP, which remained in effect until July 1.  Similarly, although the City alleges that its actions

17  to divert traffic were all within its police powers, Mtn., 13-14, that ignores Plaintiff's allegations

18  concerning the disruptions to access caused by the City's facilitation and encouragement of

19  CHOP.  As in *Hunters*, Plaintiff has stated sufficient facts to support its claim for an issue that is

20  "to be determined by the trier of fact."  *Keiffer*, 89 Wash. 2d at 411.

21      **3.**  **The court should not certify any takings issues to the Washington Supreme Court because federal constitutional law governs the issue**

22

23      The City also seeks to certify this issue of "whether temporary impairments of access that

24  allegedly do not involve the a [sic] municipality's use of police power to regulate traffic for the

25  purposes of road maintenance and construction are appropriately analyzed under the same

26  standard that applies to claims based on a government's exercise of police power for those

27

purposes."  Mtn., 15. Washington's Federal Court Local Law Certificate Procedures Act, Wash. Rev. Code §§ 2.60.010–900, authorizes the Washington State Supreme Court to accept certified questions from federal courts. Under § 2.60.020,

> When in the opinion of any federal court before whom a proceeding is pending, it is necessary to ascertain the local law of this state in order to dispose of such proceeding and the local law has not been clearly determined, such federal court may certify to the supreme court for the answer to the question of local law involved and the supreme court shall render its opinion in answer thereto.

Further, under Washington's Rules of Appellate Procedure 16.16,

> The Supreme Court may entertain a petition to determine a question of law certified to it under the Federal Court Local Law Certificate Procedures Act if the question of state law is one which has not been clearly determined and does not involve a question determined by reference to the United States Constitution.

As noted above, the issue is to be determined by reference to the United States Constitution under *Cedar Point Nursery* and *Arkansas Game & Fish Comm'n*, not state law.  *See infra*, III.C.2.  Moreover, even assuming that federal law does not provide a definitive answer, the City has not shown that is necessary to ascertain the answer to these questions in order to "dispose of [this proceeding]."

Moreover, the City has failed to demonstrate that relevant local law has not been "clearly determined."  The only state law cases that the City cites, "*Stern*, *Pande Cameron*, and *Quicksilver Audio*," (Mtn., 14) all stand for the proposition that "Washington law does not recognize a takings claim based on the government's temporary, non-permanent, interference with access." *Id.*  The City offers no other state law decisions that would suggest an alternative ruling if state law were to govern the issue, implying that this Court's decision in its January 13, 2023, ruling on the City's motion for summary judgment in the *Hunters* case was incorrect. However, "[t]here is a presumption against certifying a question to a state supreme court after the federal district court has issued a decision.  A party should not be allowed a 'second chance at victory' through certification by the appeals court after an adverse district court ruling."

OPPOSITION TO CITY OF
SEATTLE'S MOTION TO DISMISS
(Case No. 2:23-cv-00540-TSZ) - 17

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

*Thompson v. Paul*, 547 F.3d 1055, 1065 (9th Cir. 2008).  All of these deficiencies preclude the unnecessary, time-consuming and cost expanding burden of certifying an issue to the Washington Supreme Court for an issue that this Court has already addressed.

> **D.    Plaintiff's Negligence Claim Should Not Be Dismissed.**

The City's also seeks dismissal of Plaintiff's negligence claim on the basis of the public-duty doctrine. However, Plaintiff has adequately pled the "failure to enforce" exception to that doctrine.

Plaintiff acknowledges that the Court ruled against the *Hunters* plaintiffs on the issue of this exception. 2023 WL 184209 at *11-13. However, Plaintiff asks that the Court not follow its earlier decision, especially given that this is a motion to dismiss. The Court's stated concerns in its prior ruling are addressed below, and Plaintiff asks the Court to give the issue a fresh look.

That exception applies where "government agencies responsible for enforcing statutory requirements possess actual knowledge of a statutory violation, fail to corrective action despite a statutory duty to so, and the plaintiff is within the class the statute intended to protect." *Ehrhart v. King Cnty.,* 195 Wash. 2d 388, 403 (2020).

The City first claims it was not subject to a mandate to act. In determining whether a particular statute requires a municipality to act when it has knowledge of a violation, courts often look to whether the law states a municipality "shall" take certain actions. *Gorman v. Pierce Cnty.,* 176 Wash. App. 63, 79 (2013). The use of the word "shall" "is presumptively imperative and creates a mandatory duty unless a contrary legislative intent is shown." *Goldmark v. McKenna*, 172 Wash. 2d 568, 575–76 (2011).

There are two City ordinances that give rise to a duty under this rule. One is the Seattle Fire Code,[4] which provides in various provisions that the City has an affirmative duty to clear its streets of obstructions: §§ 503.1 ("Fire apparatus access roads ***shall be*** provided and ***maintained***

---

[4] The 2015 Seattle Fire Code can be found at https://www.seattle.gov/sdci/codes/codes-we-enforce-(a-z)/fire-code#2015seattlefirecode (last visited May 30, 2023). Cited portions are attached as Appendix A to this brief due to the relative difficulty in finding specific sections of the Fire Code.

OPPOSITION TO CITY OF
SEATTLE'S MOTION TO DISMISS
(Case No. 2:23-cv-00540-TSZ) **- 18**

**MORGAN, LEWIS & BOCKIUS LLP**
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400    FAX +1.206.274.6401

in accordance with Sections 503.1.1 through 503.1.3"), 503.4 ("Fire apparatus access roads **shall not be obstructed** in any manner, including the parking of vehicles"); 104.11.2 ("**No person shall obstruct** the operations of the fire department in connection with extinguishment or control or investigation of any fire").

In *Hunters*, the Court concluded that these provisions did not place an obligation on the City to act because they did not require the City to take corrective action. 2023 WL 184209 at *12.  But the code is clear: the fire department *shall* maintain the roads and those roads *shall not* be obstructed. While the exact means by which the department corrects any such obstruction is optional, the fact that it must be corrected is not.  Cases such as *Donohue v. State*, 135 Wash. App. 824, 829 (2006), where the DHS was required to issue sanctions but not take any affirmative action, are therefore inapposite.  This case is instead parallel to *Gorman*, 176 Wash. App. at 79-81, where the statute required officers to assess whether dogs were dangerous before returning them to their owners. There was any number of ways that an officer could have done that assessment, but it was clear that it had to be done, and thus the statute created a duty to a person later bitten by a dog that had not been properly assessed.  *Id.*  The Fire Code required the City to clear obstructions, by whatever means it chose.

It is also undisputed that the City was aware of the obstructions. The City had officials on scene dealing with obstructions every day and facilitated the obstruction, ¶ 79.b., and it knew exactly how it impacted Plaintiff. II.D*., infra*.

This leaves the question of whether Plaintiff was within the class of people the statute was meant to protect. Washington law is clear that

> [in] connection with this third requirement, the rule stated *Bailey v. Town of Forks* [108 Wash. 2d 262, 269–70 (1988), *amended,* 753 P.2d 523 (Wash. 1988)] … is that '[w]hen statutes intend to insure the safety of the public highways, a[n] officer's knowledge of an actual violation creates a duty of care to all persons and property who come within the ambit of the risk created by the officer's negligent conduct.'

*Livingston v. City of Everett*, 50 Wash.  App. 655, 659 (1988).[5] So, for example, in *Campbell v. City of Bellevue*, 85 Wash. 2d 1, 13 (1975), a plaintiff who died from electrocution due to a neighbor's faulty wiring, was within the scope of individuals protected by a general statute governing electrical inspections, because he was "within the ambit of the danger involved" created by a failure to follow that statute.[6]

Plaintiff was squarely within the ambit of risk created by the City's failure to clear the streets. The street in front of Plaintiff's front door was continually obstructed by CHOP barriers, City toilets, and City dumpsters. ¶¶ 62, 64.

The City also owed a duty to Plaintiff pursuant to Seattle Municipal Code § 15.52, which ***requires*** a special-event permit for "an event to be held in a park, other City-owned property, or public place [that is] … reasonably expected to cause or result in more than 50 people gathering … [and] have a substantial impact on the [place where it is held and is] expected to require provision of substantial public services; and … require temporary closure or exclusive use of a public place." SMC §§ 15.52.005 ("special event" defined); 15.52.040(A) (permit required).[7] The Code further provides that failure to get a permit is a violation of the Seattle Street Code, Seattle Municipal Code § 15.90.002, and that the City "***shall*** enforce" the Street and Sidewalk Use Code, SMC § 15.90.005(C) (emphasis added).

In *Hunters*, the Court concluded, as with the Fire Code, that the City had discretion as to how to act under the Seattle Municipal Code, and that the plaintiffs were not within the scope of those protected by the statute. But just like the Fire Code, the Seattle Municipal Code is clear that the City must act, and that is. And Plaintiff was, again, among those protected by the statute because it was clearly within the ambit of risk created by an unpermitted, illegal occupation of

---

[5] This reading of *Bailey* from the Washington courts is contrary to the Court's reading, which was that this passage from *Bailey*'s holding did not address the third element of the failure-to-enforce exception. *Hunters Cap., LLC*, 2023 WL 184209 at *12, n.18.

[6] *Ehrhart* does not hold to the contrary. In fact, in that case, the plaintiff failed to even claim the victim was within a protected class of persons. *Ehrhart*, 195 Wash. 2d at 407. The Court thus did not address the "ambit of danger" rule. *Id.*

[7] CHOP was likely a "mixed free speech event" under this ordinance, as it had both expressive and non-expressive elements. SMC § 15.52.005 (definition of "Special Event Types").

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

the park adjacent to its business. ¶¶ 32-39, 65, 72.

The City also claims that the Fire Code and Seattle Municipal Code § 15.52 cannot be used to create a duty because the City has inserted into them boilerplate disclaimers of liability. *See* Mtn. at 19. But that language is only relevant to the *legislative-intent* exception, which looks at what the government *intended*. *See, e.g., Donohoe*, 135 Wash. App. at 844-848. That is not the case with the failure-to-enforce exception, which looks at whether a statute requires action, without regard to intended purpose. *See, e.g., id.* at 848-50 (analyzing failure-to-enforce without reference to statutory purpose addressed in legislative-intent analysis); *U.S. Oil Trading, LLC v. State, Off. of Fin. Mgmt.*, 159 Wash. App. 357, 365 (2011) (same).

### E.     The Court Should Not Dismiss Plaintiff's Nuisance Claim

The City also seeks to dismiss Plaintiff's nuisance claim, on the same basis it attempted to dismiss a similar claim in *Hunters*, although it does not acknowledge the situation is identical. Plaintiff asks the Court to follow its prior ruling and not dismiss the nuisance claim.

The City's argument is that Plaintiff's negligence claim and nuisance claim are co-extensive with each other, and therefore the nuisance claim must be dismissed. Mtn. at 15-16. But in *Hunters*, as here, the plaintiffs' negligence claim was limited to violations of the Fire Code and the Seattle Municipal Code. 2023 WL 184209 at *11-*13 and Dkt. 1, ¶¶ 109, 110. And there, as here, plaintiffs' nuisance claim was far broader. 2023 WL 184209 at *15. In short, Plaintiff claims that the City's various actions combined to create a nuisance that included not just access issues but excessive noise, public safety hazards, vandalism, excessive noise. Dkt. 1, ¶¶ 113-118. That includes, for example, the establishment and maintenance of the Red Zone, providing larger and stronger barriers, the physical support of encampments on the streets and sidewalks and at Cal Anderson Park, and other facilitations detailed above. §§ II.C, E, *supra*.

The same situation in *Hunters* led the Court to hold:

the Court cannot conclude that the purported nuisance in this matter is premised solely on the City's alleged negligence in failing to enforce Seattle's Fire Code or Street Use Ordinance. Plaintiffs have significantly

narrowed their negligence claim, and, as discussed above, argue only that the City owed them a duty under those provisions. In contrast, Plaintiffs' nuisance claim is based on the City's affirmative actions in support of CHOP, such as the provision of portable toilets, handwashing stations, and dumpsters which might have encouraged protesters to remain in the area for a three-week period. … [T]he City's motion for summary judgment is DENIED as it relates to Plaintiffs' [nuisance claim].

2023 WL 184209 at *15.

This was the correct conclusion. Washington courts hold a nuisance claim is barred only where it is so indistinguishable from a negligence claim that it is a "negligence claim presented in the garb of nuisance." *Atherton Condo. Apartment-Owners Ass'n Bd. of Directors v. Blume Dev. Co.*, 115 Wash. 2d 506, 527 (1990). This necessarily requires that "the alleged nuisance is the result of defendant's alleged negligent conduct." *Id.* Thus, the doctrine has only been applied in where the alleged negligent conduct is identical to the conduct allegedly causing a nuisance, typically in cases involving construction and neighbors' trees. *See, e.g., id.* at 527-28; *Mustoe v. Ma*, 193 Wash. App. 161, 163, 169-70 (2016); *Lewis v. Krussel*, 101 Wash. App. 178, 179-80, 183 (2000).

That is not the case here. The City's only argument for a different result here is that Plaintiff has supposedly not narrowed its negligence claim to encompass only violations of the Fire Code and the Seattle Municipal Code. Mtn. at 16. But that is incorrect. Unlike in *Hunters*, Plaintiff does not have to similarly narrow its claim here because Plaintiff already expressly limited it as such in the Complaint. ¶¶ 109, 110. The Court is thus presented with precisely the same scenario and should follow its *Hunters* order as to Plaintiff's nuisance claim in this case.[8]

///      ///      ///

---

[8] To the extent the Court disagrees the Complaint is narrowed only to violations of the Fire Code and Seattle Municipal Code, Plaintiff hereby clarifies that its negligence claim in this case is intended to be co-extensive with its claim in *Hunters*, despite the Court's unfavorable ruling that Plaintiff has asked the Court to reconsider in this case.

OPPOSITION TO CITY OF
SEATTLE'S MOTION TO DISMISS
(Case No. 2:23-cv-00540-TSZ) - 22

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL +1.206.274.6400   FAX +1.206.274.6401

IV.    CONCLUSION

For the reasons stated above, the Court should deny the City's Motion to Dismiss.

DATED this 5th day of June, 2023.

*This brief contains 8,220 words, in compliance with the Local Civil Rules.*

**MORGAN, LEWIS & BOCKIUS LLP**

By *_____*
   */s/ Patricia A. Eakes*
      Patricia A. Eakes, WSBA #18888
      Angelo J. Calfo, WSBA #27079
      Tyler S. Weaver, WSBA #29413
      Gabe Reilly-Bates, WSBA #52257
      1301 Second Avenue, Suite 2800
      Seattle, WA  98101
      Phone:  (206) 274-6400
      Fax:    (206) 274-6401
      Email:  patricia.eakes@morganlewis.com
              angelo.calfo@morganlewis.com
              tyler.weaver@morganlewis.com
              gabriel.reillybates@morganlewis.com

*Attorneys for Plaintiff*